(No. 65062.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v..HAROLD BEAN, Appellant.

*Opinion filed April 18, 1990.—Rehearing denied October 1, 1990.*

74

CLARK, J., dissenting.

· Charles M. Schiedel, Deputy Defender, of Springfield, and Charles W. Hoffman, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and William P. Pistorius, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant, Harold Bean, was convicted of the murder of Dorothy Polulach (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)) following a jury trial in the circuit court of Cook County. On the State's motion, a death penalty hearing was held; the same jury found that defendant had attained the age of 18 years or more at the time of the murder and that, while two statutory aggravating factors existed, no mitigating factors existed sufficient to preclude the imposition of the death penalty (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(b)(5), (b)(6), (g)). The court

then sentenced defendant to death on the murder conviction. The jury also convicted defendant of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2), for which he was sentenced to 30 years' imprisonment, and solicitation and conspiracy (Ill. Rev. Stat. 1979, ch. 38, pars. 8—1(a), 8—2(a)), which merged with the murder conviction. Defendant's execution was stayed pending direct appeal to this court. (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a).) We affirm.

## FACTS

Defendant's involvement in the murder of Dorothy Polulach began in December 1979, when he talked with Ann and Wayne Walters after the wake for Ann's father, who had committed suicide. Ann's father and mother had been divorced, and her father had then married Polulach. During this conversation in December 1979, Ann talked about how she hated Polulach and hated the fact that Polulach would own the house her father had built for her mother, who was living with Ann and her husband, Wayne. At this time, according to the testimony of Wayne Walters, defendant gratuitously offered to "off the bitch," meaning to kill Polulach, in return for "monetary gain." Over the next year defendant intermittently discussed this idea of killing Polulach with the Walterses. When the Walterses explained that they did not have the $2,500 that defendant asked for in advance, defendant suggested they borrow the money from a neighbor, and they did so; the rest of defendant's fee for the killing, agreed to be about $23,000, was to be paid later, after Polulach's will was probated. While Ann favored the idea, Wayne had to be persuaded by his wife and defendant to accede.

Defendant planned the killing and carried it out in Chicago while the Walterses were at their home in Florida. Defendant obtained a priest's cassock and two guns.

On February 17, 1981, after setting up an appointment with Polulach, he and an accomplice went to her house while another accomplice waited in a car. After being admitted to the house by Polulach, defendant, dressed as a priest, handcuffed her hands and feet and dragged the 80-year-old woman up a flight of stairs while she kicked and screamed. When his gun did not fire, defendant sent his accomplice back to their car to get the second gun; defendant then shot Polulach twice in the back of the head. After searching the house for valuables but finding only some jewelry, which they took, defendant and his accomplice left.

Defendant then went to Florida looking for money from the Walterses, but got very little. While there, defendant told the Walterses how he had killed Polulach. Later, in April, the Walterses confessed to the Chicago police their part in the killing. When defendant heard of this, he, one of his accomplices, and his girlfriend, Deborah Youngbrandt, fled by car out of Illinois, only to return to Chicago in a few days in a stolen pickup truck minus the accomplice, who had been arrested for a traffic violation in Nebraska. After they returned to Chicago, Youngbrandt managed to escape from defendant (she considered herself kidnapped, and testified she only learned of the killing during this journey). Defendant was later found and arrested by the police.

Originally, defendant and one of his accomplices were jointly tried for murder and other offenses, and defendant was convicted and sentenced to death; but this court reversed and remanded for a new trial, holding that the original trial court erroneously refused to grant defendant's motion for severance. (*People v. Bean* (1985), 109 Ill. 2d 80, 84.) Defendant's pending conviction and death sentence resulted from a second trial.

## ANALYSIS

Defendant presents 19 issues for consideration, and he argues that either we should reverse and remand for a new trial, or we should vacate his death sentence and remand for a new death penalty hearing or imposition of a sentence other than death; defendant also seeks remand for a new sentencing hearing on his armed robbery conviction. Defendant's issues can be arranged as: (1) a challenge to the trial court's conduct of *voir dire*; (2) challenges to rulings of the trial court and this court that denied defendant discovery of a witness' mental health records; (3) challenges to the admissibility of evidence; (4) challenges to the trial court's conduct of the trial and death penalty hearing; (5) claims of ineffective assistance of counsel; (6) challenges to the appropriateness of his sentences of death and imprisonment; and (7) challenges to the constitutionality of the Illinois death penalty statute.

### *Defendant's Absence from a Portion of Voir Dire*

Defendant's first argument for reversal of his convictions and remand for a new trial is that during the individual *voir dire* of five venire members, each was brought back into the judge's chambers for further questioning, questioning from which defendant himself was absent in each instance. Defendant argues that his absence from these *in camera voir dire* sessions deprived him of his right to be present during the entire jury selection process, a right secured by the Illinois and United States Constitutions. Because defendant is not clear as to what particular provisions of the Illinois and United States Constitutions he is relying upon, we analyze his claim using the provisions we find most appropriate and most promising for the success of his claim: section 8 of article I of the Illinois Constitution and the fourteenth

amendment to the United States Constitution (Ill. Const. 1970, art. I, §8; U.S. Const., amend. XIV).

Initially, we note that there were actually six venire members questioned by the trial judge in his chambers, although defendant's argument refers to only five venire members. These discussions were initiated by the trial judge during the individual *voir dire* of each of the six venire members when three of them said that they had read or heard publicity about the murder, when two of them had difficulty expressing their views on the death penalty, and when one of them said that his previous services as a juror in a murder trial might cause him to not be fair and impartial in this trial. Each time, in open court and in defendant's presence, the trial judge instructed the venire member to come back to his chambers. Also attending these in-chambers discussions, besides the trial judge and each venire member, were defendant's two attorneys, the two prosecuting assistant Attorneys General, and a court reporter who transcribed the discussions.

Defendant's argument is divided into a broader argument and a more specific argument; his broader argument is that as a result of his absence from the *in camera voir dire* he was deprived of his right to be present at all stages of trial at which his presence was necessary, whereas defendant's more specific argument is that he was only actually prejudiced by his absence from the *in camera voir dire* of one venire member, venire member B***. In addressing both levels of this argument we make two observations: (1) none of these six venire members served on the jury which convicted defendant, and (2) if defendant had been present he could have influenced only whether venire member B*** served on the jury. This is because, of the six venire members, four were excused for cause by the trial judge, and one was a potential alternate juror but all of the alternate jurors

were chosen before she was reached. (Further negating any prejudice to defendant relating to this potential alternate juror was the excusal of the alternate jurors in this case before the jury deliberated.) Thus, defendant necessarily rests his argument of actual prejudice on his absence from the *in camera voir dire* of venire member B***, whom defendant's attorney peremptorily challenged.

Our standard of review on this issue is that of the plain error doctrine, for defendant did not raise this issue either through a trial objection or in his post-trial motion. (*People v. Precup* (1978), 73 Ill. 2d 7, 16-17; 107 Ill. 2d R. 615(a).) A plain error occurs only when a defendant is deprived of a substantial right, and thus is deprived of a fair trial, or when an error is made in a case with closely balanced evidence. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) The evidence in defendant's trial was not closely balanced, for the State presented more than sufficient evidence to support a conviction and defendant chose not to present a defense. Therefore, only if defendant was deprived of a substantial right could we recognize the *in camera voir dire* to be plain error.

Undeniably, a criminal defendant has a general right to be present at every stage of his trial, including jury selection. (*Illinois v. Allen* (1970), 397 U.S. 337, 338, 25 L. Ed. 2d 353, 356, 90 S. Ct. 1057, 1058; *People v. Smith* (1955), 6 Ill. 2d 414, 416.) This court and the United States Supreme Court, however, have limited the situations in which the denial of this broad right of presence constitutes a violation of the Illinois and United States Constitutions. We examine this issue first by applying Illinois constitutional law, then by applying Federal constitutional law.

In the past we have declared that the broad "right to be present at trial" is not itself a substantial right under

the Illinois Constitution. (See *People v. Martine* (1985), 106 Ill. 2d 429, 439.) Instead, it is a lesser right the observance of which is a means to securing the substantial rights of a defendant. Thus a defendant is not denied a constitutional right every time he is not present during his trial, but only when his absence results in a denial of an underlying substantial right, in other words, a constitutional right; and it is only in such a case that plain error is committed. (See *Martine*, 106 Ill. 2d at 439-40 (defendant absent during an offer of proof); *People v. Kubat* (1983), 94 Ill. 2d 437, 493-94 (defendant absent during a jury instructions conference); *People v. Devin* (1982), 93 Ill. 2d 326, 333-34 (defendant, later sentenced to death, absent during jury's view of crime scene); *People v. Pierce* (1974), 56 Ill. 2d 361, 365 (defendant absent when trial judge and attorneys considered how to answer jury's request for testimony of two witnesses).) Some of these substantial rights are the right to confront witnesses, the right to present a defense, and the right to an impartial jury. In the present case, the right to an impartial jury is the only substantial right possibly denied defendant.

We conclude that no plain error occurred because, although defendant's broad right of presence was improperly denied and could have affected the impartiality of the jury, defendant's absence from the *in camera voir dire* did not, in fact, have the slightest effect on the impartiality of the jury selected. Indeed, even defendant does not claim that his jury was not impartial. Instead, his argument is based upon the broad right of presence and the possibility that if he had been present he might have decided not to peremptorily challenge venire member B***, who then might have become a juror. Yet the Illinois Constitution merely grants a right to an impartial jury; thus, because defendant does not challenge the impartiality of the 12 jurors who convicted him, the pos-

sibility that this one venire member would have become a juror is of no consequence.

Defendant tries to support his position by citing cases he believes established an absolute, inflexible right of presence throughout trial in Illinois; but each of these cases shares one significant limiting fact: The defendants were absent when witnesses testified. *People v. Davis* (1968), 39 Ill. 2d 325 (defendant absent from entire trial); *People v. Mallett* (1964), 30 Ill. 2d 136 (defendant absent when witness testified to the burglary of his business, and when defendant re-entered courtroom he was not told the complete testimony before testimony resumed); *People v. Smith* (1955), 6 Ill. 2d 414 (defendant absent during presentation of his own defense and when verdict of guilty and sentence were entered).

Therefore, defendant's right to an impartial jury under the Illinois Constitution was preserved, and no plain error on these grounds occurred. Now we consider defendant's right of presence under the United States Constitution.

Under the United States Constitution, criminal defendants also have a general right to be present at their trials; significantly, though, this Federal right of presence is not an express constitutional right but arises from the due process clause of the fourteenth amendment. (*Kentucky v. Stincer* (1987), 482 U.S. 730, 745, 96 L. Ed. 2d 631, 647, 107 S. Ct. 2658, 2667; *United States v. Gagnon* (1985), 470 U.S. 522, 526, 84 L. Ed. 2d 486, 490, 105 S. Ct. 1482, 1484; *Snyder v. Massachusetts* (1934), 291 U.S. 97, 105-06, 78 L. Ed. 674, 678, 54 S. Ct. 330, 332.) Because it originates in the due process clause, the Federal right of presence is not an absolute, inviolable right; instead, its scope is contained within the scope of due process. (*Snyder*, 291 U.S. at 105-08, 116, 78 L. Ed. at 678-79, 683-84, 54 S. Ct. at 332-33, 336; see *Gagnon*, 470 U.S. at 526, 84 L. Ed. 2d at 490, 105 S. Ct.

at 1484 (citing *Snyder* and quoting favorably Stevens, J., concurring in the judgment, in *Rushen v. Spain* (1983), 464 U.S. 114, 125-26, 78 L. Ed. 2d 267, 277, 104 S. Ct. 453, 459 (" '[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror' ")).) Thus, as long as a defendant's absence from a portion of his trial does not deprive him of due process, there is no violation of a defendant's derivative due process right of presence under the United States Constitution.

The Court has further explained that the concept of due process in this context is the equivalent of a fair and just trial; consequently, the due process right of presence is violated only when a defendant's absence results in his being denied a fair and just trial. "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." (See *Snyder*, 291 U.S. at 107-08, 78 L. Ed. at 679, 54 S. Ct. at 333.) To phrase the rule another way, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure" (*Stincer*, 482 U.S. at 745, 96 L. Ed. 2d at 647, 107 S. Ct. at 2667). This means that in a particular case it must be determined if a defendant's absence resulted in an unfair trial. If it does not appear that an unfair trial resulted, the defendant's constitutional rights were not violated; this is true even if a defendant's absence in similar circumstances is usually considered to be improper. The Court has warned that the fourteenth amendment does not "assure[ ] the privilege of presence when presence would be useless, or the benefit but a shadow." (*Snyder*,

291 U.S. at 106-07, 78 L. Ed. at 678, 54 S. Ct. at 332.) Whether the benefit would have been "but a shadow" because the fairness of the trial was not affected by the defendant's absence from a portion of his trial "must be determined in the light of the whole record." *Snyder*, 291 U.S. at 115, 78 L. Ed. at 683, 54 S. Ct. at 336; see *Gagnon*, 470 U.S. at 527, 84 L. Ed. 2d at 490-91, 105 S. Ct. at 1484-85.

Defendant recognizes that his right of presence is limited to those situations when his presence is necessary to a fair trial, in other words, a critical stage of trial. Jury selection is a critical stage of trial. Defendant argues that his right to be present at this critical stage encompasses every moment of the jury selection process, and thus the fairness of his trial was impaired by his absence from the *in camera voir dire*.

Although we agree that criminal defendants generally have a right to be present throughout the jury selection process, and that usually the exclusion of a defendant from jury selection will result in an unfair trial, we disagree with the assertion that in this case the fairness of defendant's trial was impaired. Defendant's argument is based on broad principles and is not adapted to the specifics of this case. Here defendant was absent from a portion of jury selection, and so the fairness issue in this case concerns the impartiality of defendant's jury. (See *Rushen*, 464 U.S. at 118-21, 78 L. Ed. 2d at 273-75, 104 S. Ct. at 455-57 (juror's *ex parte* conversations with judge about the fact that a defense witness had been convicted of murdering juror's childhood friend were harmless error because juror testified at post-trial hearing that she was impartial, and judge and juror did not discuss facts or law of case); *Howard v. Kentucky* (1906), 200 U.S. 164, 50 L. Ed. 421, 26 S. Ct. 189 (defendant not deprived of due process by judge's excusing an accepted but unsworn juror after questioning him about his

impartiality in the absence of defendant and defendant's attorney, for defendant merely had a constitutional right to be tried by an impartial jury and did not contend that replacement juror was prejudiced).) The issue is: Did defendant's absence from the *in camera voir dire* cause him to be tried, convicted, and sentenced by a jury prejudiced against him? A new trial will be ordered only if the answer is yes.

We answer the question with a no. Defendant was tried by an impartial jury despite his absence from the *in camera voir dire.* As we said earlier, defendant does not dispute the impartiality of his jury; rather, defendant claims he had an absolute right to be present at all times and that but for his absence he might not have allowed his attorney to peremptorily challenge venire member B\*\*\*, the one potential juror who was interviewed in chambers and not excused by the trial judge. We have already explained that there is no absolute right of presence, and will later address the cases defendant cites in support. As to his claim that if present he might have decided that he wanted venire member B\*\*\* as a juror, it falls short of establishing a due process violation, for defendant does not assert that the juror who served in place of venire member B\*\*\* was prejudiced. The United States Constitution, as does the Illinois Constitution, guarantees a defendant an impartial jury, not a jury of his choice. (*Howard,* 200 U.S. at 173-74, 50 L. Ed. at 425, 22 S. Ct. at 191.) Defendant's due process rights were also not violated as a result of his absence from the *in camera voir dire* of the other five venire members; four were excused for cause by the trial judge, so defendant could not have influenced whether or not they would become jurors, and as to the fifth, a potential alternate juror who was never reached, the alternate jurors in his trial were excused after closing arguments in the guilt-innocence phase of the trial (see *Gagnon,* 470

U.S. at 527, 84 L. Ed. 2d at 490, 105 S. Ct. at 1485 (if defendant had been present at *in camera* discussion among judge, a juror concerned about defendant's sketching him, and defendant's attorney, defendant could have done nothing to affect whether juror would remain on jury)).

Defendant's argument that he had a constitutional right of presence during every moment of the jury selection process relies on two Supreme Court cases, *Hopt v. Utah* (1884), 110 U.S. 574, 28 L. Ed. 262, 4 S. Ct. 202, and *Lewis v. United States* (1892), 146 U.S. 370, 36 L. Ed. 1011, 13 S. Ct. 136. Defendant believes that in *Hopt* and *Lewis* the Court held that a defendant has a constitutional right to be present during the entire jury selection process, and that exclusion from any portion denies a defendant a fair trial and requires the reversal of his conviction. The rationale for this absolute right of presence is that a defendant is entitled to see and hear every venire member so that he, not his attorney, can decide whom to peremptorily challenge based on his own unique and highly subjective perspective on and reactions to each venire member. In support of this rationale, defendant quotes a passage of *dicta* in *Hopt* concerning the special insight a defendant may contribute to his own defense; but defendant disregards the fact that in *Hopt* the Court was analyzing provisions of the criminal code of the Territory of Utah, and defendant ignores the import of the first part of that quotation: "The prisoner is entitled to an impartial jury composed. of persons not disqualified by statute, ***." (*Hopt*, 110 U.S. at 578, 28 L. Ed. at 265, 4 S. Ct. at 204.) The import of that quotation, and to a lesser extent the entire opinion, is that a defendant's personal presence is needed to ensure empanelment of an impartial jury, not a jury of defendant's choice, for by his presence as well as his active assist-

ance of his counsel he may reveal venire members' prejudices.

Furthermore, neither *Hopt* nor *Lewis* held that there is a constitutional right to be present throughout jury selection. The facts in *Hopt* were that the Utah criminal code provided that in all felony trials defendants must be present at the trial, including a hearing at which the parties' challenges for actual bias are "tried"; the Court held that defendant and his attorney, who had been excluded from such a hearing, had a right to attend this hearing in order to elicit facts supporting any challenge for actual bias. (*Hopt*, 110 U.S. at 576-78, 28 L. Ed. at 263-65, 4 S. Ct. at 203-04.) Thus, the Court held in *Hopt* that defendant had been deprived of his liberty, and would be deprived of his life, without due process of law as a result of his exclusion from a stage of trial at which the criminal code required a defendant's presence. The Court did not hold that the due process clause of the fourteenth amendment created a right to be present. (*Hopt*, 110 U.S. at 579, 28 L. Ed. at 265, 4 S. Ct. at 204-05.) In *Lewis*, the Court reviewed an unusual jury selection procedure: The trial court gave the State and defendant a list of the venire and required them to use their peremptory challenges without first seeing the venire members or having them submit to *voir dire*; of the unchallenged venire members, the first 12 were sworn as jurors. The Court disapproved this procedure and held that the common law gives criminal defendants the right to meet venire members face to face and as a group before exercising peremptory challenges, so that defendants can choose among them. The Court did not hold that the Constitution created such a right of presence. (And in the present case defendant did meet the venire members face to face, as *Lewis* demands.) Our conclusion that the Court in *Hopt* and *Lewis* did not recognize a constitutional right to be present has been

reached thrice by the Court itself. *Allen*, 397 U.S. at 342, 25 L. Ed. 2d at 358, 90 S. Ct. at 1060; *Snyder*, 291 U.S. at 117 n.2, 78 L. Ed. at 684 n.2, 54 S. Ct. at 336 n.2; *Diaz v. United States* (1912), 223 U.S. 442, 458-59, 56 L. Ed. 500, 507, 32 S. Ct. 250, 255.

Defendant also cites as support a case decided by the Idaho Supreme Court reversing a defendant's burglary conviction and ordering a new trial because the defendant was absent during jury selection. (*State v. Carver* (1972), 94 Idaho 677, 496 P.2d 676.) In clear contrast with the present case, though, is the fact that the defendant in *Carver* was absent from the entire jury selection process and had no input into the exercise of peremptory challenges. Given this significant factual difference, we are not persuaded that the fundamental nature of the right of presence recognized by the *Carver* court warrants a new trial in this case.

Although we agree with defendant's exposition of why he should have been present throughout jury selection, defendant's argument does not establish an absolute, inviolable right of presence, which if applied to the present case would require a new trial even though defendant's presence at the *in camera voir dire* could not have affected the judge's excusal of four venire members, and even though defendant has not shown that his absence resulted in a prejudiced juror serving on his jury. Yet while we hold that defendant's due process right of presence was not violated in this case, we note that the procedure of *in camera voir dire* without defendant's presence and without defendant's express waiver of this right is improper and, in some cases, will inevitably result in the denial of a defendant's fundamental rights to a fair trial by an impartial jury.

To conclude, we hold that defendant's right to be present at his trial was not denied him because the facts of the present case are such that he was not denied ei-

ther his substantial rights under the Illinois Constitution or his due process rights guaranteed by the fourteenth amendment of the United States Constitution; defendant enjoyed a fair trial and was tried, convicted, and sentenced by an impartial jury.

### Discovery of Witness' Mental Health Records

Defendant asserts that his sixth amendment rights to confront and to cross-examine witnesses against him were violated because the trial court did not give his counsel access to all of the mental health records of an important State witness, Deborah Youngbrandt. Youngbrandt testified for the State at both of defendant's trials, and her testimony was similar at both.

Youngbrandt was defendant's girlfriend at the time of the murder and testified as follows. In early April 1981 she, defendant, and Danny Egan, who admitted that he drove defendant to and from the murder, drove her car out of Illinois after defendant heard that the Walterses had confessed to the police. Defendant initially told her that she would be let out of the car at the Illinois-Missouri border, but she was not, instead staying with defendant for approximately a week as he drove through a number of States and then returned to Chicago, where she escaped. During this journey Egan was arrested in Nebraska for a traffic violation, and defendant stole a set of license plates and a pickup truck and then abandoned Youngbrandt's car. Most importantly, during this journey defendant described to Youngbrandt in detail how he had murdered an elderly woman by dressing as a priest, including the fact that the first gun did not fire, and when Youngbrandt expressed disgust he stated that he had not tortured the woman; defendant also said that the murder was "business," and there should not have been any risk involved but he had not expected the Walterses to confess. Youngbrandt further testified that

the State's Attorney's office had helped her recover her car and find a new apartment and had given her rent money.

Before trial, defense counsel moved for an order that the State disclose all psychiatric records generated as a result of Youngbrandt's voluntary hospitalization on seven occasions between June 1981 and March 1986 for problems with depression and chronic alcoholism. Defendant also sought a court-ordered psychiatric examination of Youngbrandt and a fitness hearing. The court denied the last two requests, but it subpoenaed all of Youngbrandt's mental health records. The trial judge reviewed these records *in camera*, without disclosing any of the records to defense counsel or the prosecution.

The judge then held two *in camera* hearings at which both defense counsel and the prosecutors were present. At these hearings, the judge explained that he had reviewed the records looking for information that would bear on Youngbrandt's competence as a witness and would be relevant to impeach her credibility. He orally disclosed certain information he found relevant and also disclosed six pages of records. These six pages comprised discharge summaries for two hospitalizations in 1981 and two pages of handwritten notes revealing Youngbrandt's conversations with therapists. In these six pages, psychiatric personnel identified the many sources of the stress that had caused Youngbrandt to experience depression, alcoholism, and suicidal tendencies. These sources included defendant's "kidnapping" Youngbrandt, her being placed in protective custody when she returned to Chicago, her worries about being a witness in defendant's first trial, and threats she had received from defendant's sister. The records revealed that she felt guilty about her involvement in the murder case and its effect on her family, and that she resented defendant because as a result of his actions she had to

get a new apartment, a new job, and new friends. The disclosed records also contained statements about her depression, chronic alcoholism, and other aspects of her mental state, and contained information about what drugs were prescribed for her, her use of illegal drugs, and some of the other problems in her life and how they affected her. Additionally, the trial judge told the attorneys that Youngbrandt had been depressed in February 1986 in part because she would have to testify at defendant's second trial.

The trial judge found irrelevant all other information in the records that he had not disclosed, and he stated that the records did not indicate that Youngbrandt had at any time been delusional or suffering from a mental illness affecting her perceptual abilities or memory. Though he refused to disclose these other records, the trial judge did not restrict to any extent the scope of the defense's cross-examination of Youngbrandt about her mental health problems. In addition, access to the other records was denied the prosecution, as well as the defense.

At trial, defense counsel used some of the disclosed information in his cross-examination of Youngbrandt. Defense counsel asked her if she had told her psychiatrist that she had witnessed a murder, as one of the discharge summaries stated; Youngbrandt explained that this was incorrect and her psychiatrist must have misunderstood. Under cross-examination Youngbrandt admitted that in 1981 she had used marijuana and been prescribed lithium, was an alcoholic, and had taken Valium to try to wean herself off alcohol. But Youngbrandt also stated that in April 1981 she had not drunk excessively or taken Valium. Further, she testified that at the time of the trial she was not using any medication. Defense counsel also asked other questions to try to discredit her reliability as a witness. Yet notably defense counsel did

not ask Youngbrandt about her many hospitalizations; or about her statement in 1981 to a therapist that she resented defendant, which was included in the disclosed records; or about other indications in the disclosed records that this entire incident created great stress and disrupted her life.

Defendant argues that in granting the right to confront and cross-examine witnesses the sixth amendment (U.S. Const., amend. VI) grants defendants, or at least their attorneys, the right to read through the mental health records of witnesses. Defendant recognizes that in Illinois mental health records are privileged, confidential, and not subject to disclosure in any judicial proceeding (Ill. Rev. Stat. 1979, ch. 91½, par. 803), but argues that his sixth amendment rights are paramount over Youngbrandt's statutory rights. Defendant rests his argument on the authority of *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, our affirmance of the decision in *People v. Dace* (1983), 114 Ill. App. 3d 908, *aff'd* (1984), 104 Ill. 2d 96, and other decisions of the appellate court.

The State counters by distinguishing *Davis* from the present case, by noting that courts have repeatedly stated that the right to cross-examine is not absolute but is subject to the discretionary control of trial judges, by contending that in this case the trial judge's *in camera* inspection of the mental health records fairly protected the rights of both defendant and Youngbrandt, and by citing to our decision in *People v. Foggy* (1988), 121 Ill. 2d 337, concerning disclosure of a rape victim's statutorily privileged communications to rape crisis counselors. In *Foggy*, the trial court denied defendant's motion for an *in camera* review of records in order to determine if the records, which were created by a rape crisis counselor and contained communications between the counselor and the rape victim about the rape, contained any

impeaching evidence, even though defendant did not seek to have his attorney present at the review. This court upheld the trial court's ruling, finding that the defendant's constitutional right to confront witnesses was not violated because the defendant had not shown that the records he sought contained any impeaching information and because of the strong public policy underlying the unqualified privilege of confidentiality for communications to rape crisis counselors.

After considering the arguments of both defendant and the State, we conclude that defendant's sixth amendment rights were not denied him when the trial judge refused to give him and his attorneys access to all of Youngbrandt's mental health records. In being denied access to these records, defendant was not denied an opportunity to effectively cross-examine Youngbrandt. (See *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435; *Delaware v. Fensterer* (1985), 474 U.S. 15, 19-20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 (*per curiam*).) To be more specific, defendant was denied neither an opportunity to discredit Youngbrandt's abilities to perceive, recall, and relate events, nor an opportunity to impeach her by revealing any biases or improper motives she might have had for testifying. Because the right to confront and cross-examine is not absolute (*Van Arsdall*, 475 U.S. at 679, 89 L. Ed. 2d at 683, 106 S. Ct. at 1435), our conclusion necessarily depends upon the particular facts of this case. Nonetheless, we also rely on certain governing principles, established by the Court, that control a criminal defendant's access to privileged information.

In *Davis*, the Court first dealt with the conflict between a criminal defendant's right to cross-examine a witness and the interests of the State and of the witness in keeping certain information confidential. Defendant views *Davis* as supportive of the proposition that a

court's refusal to disclose all of a witness' mental health records effectively deprives a defendant of his constitutional rights to confront and to cross-examine. The State, on the other hand, thinks that *Davis* established a narrower rule: A court commits constitutional error if, while it allows defense counsel to ask questions on cross-examination suggesting that a witness is biased, the court bars defense counsel from informing the jury of the reason why the witness might be biased. We find the State's characterization of the holding in *Davis* to be closer to the mark.

In *Davis*, the crucial witness in a burglary trial was a juvenile who, at the time of the burglary and at the time of trial, was on probation after having been adjudicated a delinquent on two charges of burglary. This juvenile had identified defendant's photograph and had identified defendant in a lineup as the man he spoke with on the day of the burglary near the spot where the stolen safe was found, which was on the property of this juvenile's parents. Apparently, defendant was arrested as a result of this juvenile's identification. And at trial, this juvenile was the only lay witness to link defendant with the burglary. Before the juvenile testified, the prosecutor moved for a protective order barring all reference to the juvenile's record of delinquency. Defense counsel explained that he would not use this evidence to make a general attack on the juvenile's character, but argued that he should be allowed to inform the jury that the juvenile had a possible motive for misidentifying the defendant and lying—to divert any suspicion from himself and thus prevent the revocation of his probation. The trial court disagreed with defense counsel and granted the protective order. *Davis*, 415 U.S. at 309-12, 39 L. Ed. 2d at 350-51, 94 S. Ct. at 1108.

Regardless, defense counsel's cross-examination was designed to elicit an admission from the juvenile that

when the police questioned him about the safe's being found on his parents' property he was worried that the police might suspect he was the burglar. But the juvenile, although conceding that he thought the police might suspect him, said this had not worried him. He also denied ever having been questioned by the police "like that" before. *Davis*, 415 U.S. at 314, 39 L. Ed. 2d at 352, 94 S. Ct. at 1109.

The Court began by stating that the right to cross-examine a witness included the right to impeach the witness by revealing possible biases and ulterior motives the witness might have for testifying. (*Davis*, 415 U.S. at 315-16, 39 L. Ed. 2d at 353-54, 94 S. Ct. at 1109-10.) The Court then held that defendant was denied the right of effective cross-examination because "[o]n th[o]se facts" defense counsel was not able to "develop the issue of bias properly to the jury," for "[w]hile counsel was permitted to ask [the witness] *whether* he was biased, counsel was unable to make a record from which to argue *why* [he] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." (Emphasis in original.) (*Davis*, 415 U.S. at 318, 39 L. Ed. 2d at 355, 94 S. Ct. at 1111.) As a consequence of defense counsel's inability to present evidence showing why a witness might be biased, a jury might view defense counsel's cross-examination with disapproval as a groundless attack on the witness. In addition, the Court believed that the juvenile improperly used the protective order as a shield to untruthfully answer that he had never been questioned by the police "like that" before, despite his delinquency record. The Court concluded its analysis by declaring that the witness' and the State's interests in the confidentiality of juvenile justice records are subordinate to a defendant's constitutional right to effectively cross-examine an ad-

verse witness to show bias. *Davis*, 415 U.S. at 319-20, 39 L. Ed. 2d at 355-56, 94 S. Ct. at 1111-12.

We think *Davis* established the rule that a trial court cannot bar defense counsel from exploring the subject of a crucial witness' potential bias on cross-examination, including the reason for that potential bias, even if this information is protected by a statutory privilege intended to protect the witness; such information is valuable in the jury's evaluation of the truthfulness of the witness' testimony. In the present case, this rule was not violated; defendant was given full rein to cross-examine Youngbrandt about her mental health. *Davis* does not demand that we hold that the right to effective cross-examination required the trial court to allow defendant or his counsel to read all of Youngbrandt's privileged mental health records to assure themselves that all relevant and otherwise proper information that could be used to impeach Youngbrandt had been disclosed. We decline to hold that defendant's sixth amendment rights were violated. Our conclusion is supported by the Court's subsequent explanation of its *Davis* holding in *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 94 L. Ed. 2d 40, 107 S. Ct. 989 (opinion by Powell, J., joined by Rehnquist, C.J., and White and O'Connor, JJ.). See also *Van Arsdall*, 475 U.S. at 679, 89 L. Ed. 2d at 683, 106 S. Ct. at 1435 (confrontation clause is violated when defense counsel is barred from all inquiry about a witness' possible bias and motive for testifying, but trial judges retain power to limit such cross-examination on such bases as irrelevancy and confusion of the issues); *United States ex rel. Blackwell v. Franzen* (7th Cir. 1982), 688 F.2d 496 (defendant's sixth amendment rights not violated when his attorney was allowed, during cross-examination of a government witness, to develop a variety of reasons why witness' testimony was unreliable but was not allowed to

elicit contents of a privileged conversation between the witness and his attorney).

*Ritchie* specifically dealt with the situation in the present case: whether a defendant has a constitutional right to review statutorily privileged information about a witness so he can argue the relevancy and admissibility of the information to the court. Although *Ritchie* was a plurality opinion, five Justices concurred in the judgment and concurred that while the defendant had a constitutional right to all material information contained in statutorily privileged records, he had no right to review the full records himself or through his attorney; instead, the trial judge alone should review the records *in camera* and should then disclose only material information. *Ritchie*, 480 U.S. at 58-61, 94 L. Ed. 2d at 58-60, 107 S. Ct. at 1002-04.

*Ritchie* involved child abuse records. The defendant was tried for sexually abusing his daughter, who was the main witness against him at trial. He sought disclosure of records compiled by a State agency which investigated a number of reports that his daughter was an abused child. The trial judge denied defendant's motion for disclosure of the records after reviewing some, but not all, of the records *in camera*. Neither the prosecutor nor defense counsel had access to any of the records. *Ritchie*, 480 U.S. at 43-45, 94 L. Ed. 2d at 48-49, 107 S. Ct. at 994-95.

The disagreement among the concurring Justices did not concern whether defendant had a right of access to these privileged records; rather, the disagreement concerned which constitutional right gave defendant a right to material information contained in these privileged records. Four Justices found the right of access to material information to be encompassed by the due process right to all information known to the prosecution that is either favorable to the accused or material to guilt or punish-

ment (material evidence is information that, if disclosed to the defense, probably would have changed the outcome of the trial). (*Ritchie*, 480 U.S. at 57-58, 94 L. Ed. 2d at 57-58, 107 S. Ct. at 1001-02.) They rejected the claim that the confrontation clause, as interpreted in *Davis*, gave defendant a right to any of this privileged information. They explained that in *Davis* the confrontation clause was implicated because the trial judge had infringed defendant's right of confrontation, which is a trial right, by barring defense counsel from cross-examining a witness about privileged information known to defense counsel; in contrast, defendant's trial right of confrontation was not infringed in *Ritchie* because the trial court did not limit defense counsel's cross-examination, even though the trial court did deny defendant pretrial discovery of privileged information. (*Ritchie*, 480 U.S. at 52-53 & n.9, 94 L. Ed. 2d at 54 & n.9, 107 S. Ct. at 999 & n.9.) According to these four Justices, the right to confrontation is not violated when the scope of cross-examination is not directly limited at trial but rather is indirectly limited by barring pretrial discovery of privileged information. Justice Blackmun, the fifth concurring Justice, disagreed; he thought that it was the right to effective cross-examination that gave a defendant a right to discover impeaching information contained in privileged records, and Justice Blackmun stated that denying such pretrial discovery violated the right to confrontation just as surely as did barring defense counsel from cross-examining a witness about impeaching information already known to defense counsel, as in *Davis*. Nevertheless, Justice Blackmun agreed that the confrontation clause did not give a defendant a right to review privileged records himself or to have his attorney do so. *Ritchie*, 480 U.S. at 65, 94 L. Ed. 2d at 62, 107 S. Ct. at 1006.

The critical part of the *Ritchie* decision for this case is not which constitutional provision requires that a defendant have access to material privileged information, but the procedure for reviewing these privileged records approved by a majority of the Court as not violative of either the sixth amendment or the fourteenth amendment's due process clause. (*Ritchie*, 480 U.S. at 58-61, 65, 94 L. Ed. 2d at 58-60, 62-63, 107 S. Ct. at 1002-04, 1006 (opinion of Powell, J., joined by Rehnquist, C.J., and White and O'Connor, JJ.; Blackmun, J., concurring in part and concurring in the judgment).) The five Justices of the majority concluded that a defendant does not have a constitutional right, under either the due process clause or the sixth amendment confrontation clause, to make his own search of privileged records; the due process right to a fair trial is fully protected, as is the State's and the witness' statutory right to preserve the confidentiality of child abuse records, if the trial court reviews the records *in camera* and uses its discretion to disclose only material information, which includes impeaching information. A defendant has no right to cast his " 'advocate's eye' " over statutorily privileged records. But if a defendant knows of any particular information contained in the privileged records, "he is free to request it directly from the court, and argue in favor of its materiality." *Ritchie*, 480 U.S. at 60, 94 L. Ed. 2d at 59, 107 S. Ct. at 1003.

The *in camera* review procedure prescribed by the Court in *Ritchie* was precisely the procedure used by the trial judge in the present case: He reviewed Youngbrandt's psychiatric records himself and, without giving access to either defense counsel or the prosecution, held a hearing at which both parties were allowed to argue their positions; the trial judge then disclosed, orally and by releasing copies of certain pages of the records, all information he thought was relevant and could

be used to impeach Youngbrandt. Furthermore, this procedure was as appropriate in this case involving mental health records privileged by the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1979, ch. 91½, par. 801 *et seq.*) as it was in *Ritchie*, which involved privileged child abuse records. In passing the Act, the Illinois legislature expressed a strong public policy in maintaining the confidentiality of records and communications made "during or in connection with providing mental health *** services to a recipient" (Ill. Rev. Stat. 1979, ch. 91½, par. 802(1)) in all circumstances except for stated exceptions (Ill. Rev. Stat. 1979, ch. 91½, pars. 804(a), 806 through 812.2), none of which apply in this case. This public interest, and the individual recipient's interest, in maintaining the secrecy of this personal information in order to assist the individual's recovery (see *Novak v. Rathnam* (1985), 106 Ill. 2d 478, 483) justifies its protection from the unlimited scrutiny of a criminal defendant or defense counsel wielding the sixth amendment as a weapon before which all other interests must fall.

We conclude that this procedure did not violate defendant's sixth amendment rights to confront and to have an opportunity to effectively cross-examine witnesses against him. (See *People v. Barkauskas* (1986), 147 Ill. App. 3d 360 (defendant's sixth amendment rights not violated when trial court inspected a witness' mental health records *in camera* and, without input from either the prosecution or defense, decided what information would be disclosed).) The rights to confront and to cross-examine do not encompass the right to full knowledge about a witness' mental health problems in the hope of finding impeaching information that a trial judge might overlook; these rights are secured even though a defendant has to rely upon a court's judgment of what is relevant and impeaching. And just as a trial judge can limit

cross-examination to prevent inquiries that are irrelevant, repetitive, or too time-consuming, that harass the witness, or that threaten to distract the jury from the actual issues by unduly emphasizing details of the witness' life, a defendant's access to statutorily privileged information can be limited by the same considerations. Thus, when the patient or a therapist asserts the privilege, a trial judge can review *in camera*, without disclosure to any attorneys, a witness' mental health records and disclose only those portions that are relevant when that relevance is not outweighed by other factors.

Defendant argues that the *in camera* review conducted in the present case was improper under this court's previous decision in *People v. Dace* (1984), 104 Ill. 2d 96, *aff'g* (1983), 114 Ill. App. 3d 908, and we should therefore hold that defendant's rights were violated. In *Dace*, the testimony of an accomplice was the sole evidence that the defendant had committed a burglary. The accomplice had been involuntarily committed to a mental health hospital 1½ years before the burglary. The trial court had barred defense counsel from discovering any information about the witness' mental health and from inquiring into this subject on cross-examination, ruling that the information was too old to be relevant. (*Dace*, 114 Ill. App. 3d at 911-12.) The appellate court held that when it reasonably appears that a witness' mental health history is relevant, a court should permit discovery of the information and then, if the witness asserts the privilege, hold a hearing at which the prosecution and defense may argue over the admissibility of the information as relevant to the witness' credibility. (*Dace*, 114 Ill. App. 3d at 915.) We affirmed the appellate court's judgment on other grounds, and we briefly commented that "we agree with the appellate court that, under the circumstances shown by the evidence, the refusal to permit the discovery was reversible

error." (*Dace*, 104 Ill. 2d at 103.) Defendant erroneously reads this *dictum* as a holding by this court that the only procedure appropriate when discovery of privileged information is sought is the procedure outlined by the appellate court in *Dace*.

We find not only that the review procedure used here was proper, but that the trial court did not err in its decision as to what information was relevant and properly should have been disclosed to defendant. We have reviewed all of Youngbrandt's mental health records and cannot say that the trial court abused its discretion, manifestly prejudicing defendant. (See *People v. Collins* (1985), 106 Ill. 2d 237, 269; *United States v. Cameron* (7th Cir. 1987), 814 F.2d 403, 406.) All of the undisclosed information contained in the records was irrelevant to Youngbrandt's credibility, for it neither indicated any bias against defendant nor revealed Youngbrandt to be lacking in her abilities to perceive, remember, or relate the occurrences about which she testified. The trial court disclosed all of the information relevant to impeachment of Youngbrandt, including information about her chronic alcoholism, her drug use, and her resentment toward defendant for disrupting her life (defendant argues he should have had access to the records to determine the reasons why Youngbrandt resented him and was depressed in part because she had to testify at his trials, but the records contain no information on these issues beyond what was disclosed). Furthermore, the trial court did not in any way limit defense counsel's use of the disclosed information during the cross-examination of Youngbrandt. We find no error on this issue.

Defendant further claims that his appellate counsel should have been allowed to review Youngbrandt's mental health records; defendant reasons that his appellate counsel had to be allowed to learn the contents of these records in order to convincingly argue to this court that

defendant's trial counsel should have been allowed to review the records because they contain relevant impeaching information. We denied appellate defense counsel's prior motion for such access. Now defendant claims that by denying that motion this court deprived him of his sixth amendment right to the effective assistance of appellate counsel (see *Evitts v. Lucey* (1985), 469 U.S. 387, 83 L. Ed. 2d 821, 105 S. Ct. 830 (due process requires that a defendant receive effective assistance of counsel during his first appeal as of right)).

Although we recognize that the argument of defendant's appellate counsel was limited by his inability to point to portions of the mental health records and argue that they were discoverable, this limitation did not cause defendant's appellate counsel to be ineffective when arguing this issue. When deciding a claim of ineffective assistance of appellate counsel we apply a standard of fairness. (See *Evitts*, 469 U.S. at 392, 396-97, 83 L. Ed. 2d at 827, 830-31, 105 S. Ct. at 833, 836 (Court decided case on due process grounds and held that to be effective appellate counsel must give assistance of such quality as to make the appellate proceedings fair); see also *Strickland v. Washington* (1984), 466 U.S. 668, 685, 696, 80 L. Ed. 2d 674, 692, 699, 104 S. Ct. 2052, 2063, 2069 (stresses that in deciding a claim of ineffective assistance of counsel the focus is on "the fundamental fairness of the proceeding whose result is being challenged" and whether the adversarial quality of our justice system was preserved).) This appellate proceeding was not unfair in consequence of the discovery limitation we imposed on appellate defense counsel. As part of our consideration of counsel's argument we reviewed the mental health records mindful of defendant's limited knowledge of the contents. In addition, the State had no greater knowledge of these records' contents at either the trial or appellate proceedings. Thus, neither party was able to

make the kind of detailed adversarial argument that otherwise would have been possible, and the comparative quality of the arguments of these two adversaries was unaffected by our ruling.

## Admissibility of Other Evidence

Defendant argues that he was also deprived of his constitutional rights to confront and cross-examine witnesses because he was not allowed to confront and cross-examine two people, Ann Walters and defendant's ex-wife, Gerri Smith, who were not called as witnesses but whose statements were admitted at trial through the testimony of Wayne Walters. Defendant contends that Wayne Walters' testimony was hearsay, and defendant further contends that the admission of this testimony, despite the State's failure to call Ann Walters or Gerri Smith as a witness, caused him to be deprived of his constitutional rights. Defendant asks us to grant him a new trial on this basis, although no objection was made to this testimony at trial and the issue was not included in defendant's post-trial motion for a new trial. We decline to do so, for we find that this issue was waived and does not constitute plain error warranting our attention (107 Ill. 2d R. 615(a)).

The testimony about which defendant complains consists of the following statements made by Wayne Walters during his direct examination:

"Q. Now *** the 17th of February, 1981, did you receive a call from Gerri Smith?

A. Yes. *** We received a phone call from Gerri Smith that morning.

* * *

Q. After that phone call from Gerri Smith, on the 17th of February, 1981, did Harold Bean call your house?

A. Yes.

\* \* \*

Q. Who told you Harold Bean had called?

A. My wife.

Q. Ann?

A. Yes.

Q. What did Ann tell you regarding Harold Bean's phone call?

A. She says, 'Harold is coming back into town. He needs to talk to us. He did it, and he needs money.' And I said—

Q. Did you understand what Ann meant when she said, 'He did it'?

A. Oh, yes. Because when Gerri called, she said, 'That has been done. Dorothy was killed.' "

Defendant characterizes the above testimony as highly prejudicial hearsay because Wayne Walters testified that defendant had confessed to both Ann and Gerri that he had killed Polulach, yet defense counsel was never able to question Ann or Gerri about these confessions. We characterize this testimony differently. It was not highly prejudicial, for immediately following the testimony quoted above Wayne Walters testified that when he met with defendant the next day defendant described in detail how he had killed Polulach.

The admission of this testimony was not plain error. The other evidence presented at trial was more than sufficient to support defendant's conviction—the evidence was not closely balanced (see *People v. Carlson* (1980), 79 Ill. 2d 564, 576). Furthermore, assuming defendant's substantial rights are involved and that error was committed, we do not find that the error was so devastating that defendant was denied a fair trial. See *People v. Howell* (1975), 60 Ill. 2d 117, 120-21.

Because we decline to recognize as plain error the trial court's admission of the above testimony and failure to exclude the testimony on its own initiative, we do not decide whether it in fact was hearsay because it was of-

fered to prove the truth of the assertion that defendant killed Polulach or whether it was offered for another purpose, such as to explain Wayne Walters' subsequent actions; nor do we decide whether this testimony fell under the hearsay rule's exception for statements made by co-conspirators, as suggested by the State.

Defendant next asserts that he was denied his constitutional right to have a jury fairly determine his guilt or innocence of the crimes for which he was tried because witnesses testified that defendant said he had murdered someone in the past, that defendant threatened to murder various people, and that defendant committed two crimes during his journey out of Illinois. Defendant argues that either this testimony was irrelevant or its relevance was outweighed by its prejudicial implication that defendant had a propensity to commit murder.

Defendant waived these claims by failing to object to any of this testimony at trial and by failing to raise these claims in his motion for a new trial. (*People v. Adams* (1985), 109 Ill. 2d 102, 116.) The plain error doctrine does not save these claims because as to each piece of testimony cited by defendant we find that either it was admissible or, although inadmissible, its admission did not constitute plain error depriving defendant of a fair trial. See *Carlson*, 79 Ill. 2d at 576-77; 107 Ill. 2d R. 615(a).

Defendant most strenuously attacks the admissibility of a statement Wayne Walters made in response to the prosecutor's question if there was "any further discussion about what Mr. Bean had volunteered to do." Wayne Walters answered that Ann asked defendant why he would murder Polulach and defendant said, " 'Well, it's been done before,' or, 'I've done it before,' or something of that nature." Defendant believes that the prosecutor gratuitously elicited this testimony merely to persuade the jury that defendant had committed a

murder-for-hire in the past and so had a propensity to murder. We find this testimony to have been admissible because it was relevant and its relevance was not outweighed by any potential prejudice to defendant. This testimony was relevant to defendant's intent and willingness to murder Polulach. The statement reveals how serious defendant was about committing the murder during this initial conversation with his co-conspirators. While evidence of other crimes is not admissible if it only shows that a defendant has a bad character or a propensity to commit crime in general, evidence of other crimes is admissible if relevant to any other material issue. *E.g., People v. Baptist* (1979), 76 Ill. 2d 19; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.5, at 162-63 (4th ed. 1984); see *People v. Lindgren* (1980), 79 Ill. 2d 129 (new trial ordered because extensive evidence of an arson, not relevant to any material issue in defendant's murder trial, might have led jury to convict defendant where jury would not have done so if evidence had not been admitted).

Furthermore, we think that any prejudice against defendant created in the jurors' minds by this testimony would have been very slight for a variety of reasons. Wayne Walters' testimony itself was confused, and it conveyed merely that defendant might have claimed to have murdered someone before. The subject was not revived by the State, either by introducing other evidence of such a murder or by mentioning this testimony in its closing statement. In addition, whether or not the State elicited this testimony "gratuitously" has no effect on our analysis of whether plain error occurred. Besides, reading this testimony in context we disagree with defendant that the prosecutor "gratuitously elicited" this ambiguous testimony of a prior murder; instead, it appears the prosecutor was trying to establish the element of the case that defendant was to be paid for the mur-

der, for the prosecutor next asked why defendant would commit a murder and Walters said defendant then said he wanted to be paid for it.

Defendant also objects that the following testimony was inadmissible and improperly prejudiced the jury against him: testimony that defendant threatened Ann Walters that he would kill her husband or her mother if the Walterses did not pay him $5,000; Danny Egan's testimony that, after learning that the Walterses had confessed to police, defendant said he and Egan would have to kill the Walterses; and Egan's testimony that, when their car was stopped by a policeman in Nebraska during their flight from Illinois, defendant said they would have to kill the policeman because they could not be stopped.

We find that the testimony about defendant's threats to Ann if he were not paid $5,000 was relevant to prove the State's allegations that defendant expected to get paid for murdering Polulach. As to the testimony that defendant threatened to kill the Walterses and a policeman, it was relevant to defendant's consciousness of guilt because in both instances the threat was made by defendant as part of his plan to evade arrest for the murder. (See *People v. Turner* (1989), 128 Ill. 2d 540 (not plain error for trial court to admit testimony that defendant told a cellmate that he planned to escape and would kill anyone who got in his way); *Baptist*, 76 Ill. 2d at 27 (evidence that defendant attempted to kill an eyewitness relevant to show consciousness of guilt); *People v. McGuire* (1966), 35 Ill. 2d 219 (evidence of other crime admissible if it indicates that defendant resisted arrest for crime charged and so shows consciousness of guilt); *People v. Spaulding* (1923), 309 Ill. 292 (evidence that defendant attempted to or did destroy evidence against him, or that he killed a witness, is always admissible to show defendant's consciousness of guilt).) The jury could properly consider these threats as evidence of

defendant's guilt of the murder of Polulach, believing that an innocent man would not threaten to kill three people. The threat to kill the policeman was also relevant because it refuted any thoughts by the jurors that defendant might have driven out of State with Egan and Youngbrandt for some reason unconnected to the murder.

Concerning defendant's allegation that this testimony improperly prejudiced him because the jury might have concluded from it that defendant had a propensity to commit murder, we find the probativeness of the testimony to have outweighed any possible prejudice, for these were only threats of murder which defendant did not carry out. Additionally, any possible prejudice was minimized because the State did not refer to any of these threats in its closing statement. (*Cf. People v. Lampkin* (1983), 98 Ill. 2d 418 (testimony that a defendant being tried for the murder of a policeman had told another policeman, six years before the murder, that he would "get" "white coppers" was too old and generalized to be relevant, and a new trial ordered because the prosecutor repeatedly referred to threat and made it part of the State's theory of the case).) Thus, the trial court did not commit plain error in admitting any of this testimony.

Defendant also alleges error due to the admission of evidence that during his flight he stole a set of license plates and a pickup truck. Defendant merely contends that this evidence should have been excluded as being more prejudicial than probative. We disagree; the evidence of these crimes was relevant to show defendant's consciousness of guilt for they, like the threat to kill the police officer, revealed that defendant was fleeing and trying to evade arrest, and that he had not left Illinois for some innocent purpose. Nor was this evidence unduly prejudicial, for two reasons. First, these thefts were

such minor crimes compared to murder that the jury would not have convicted defendant of murder on the basis that these thefts showed him to have a bad character. Second, the trial court instructed the jury to consider these crimes only as they related to the "circumstances of defendant's flight and arrest" and not for any other purpose (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981) (hereinafter IPI Criminal 2d)), thereby minimizing any possible resultant prejudice. Thus, we find no plain error in the admission of this evidence.

### The Conduct of the Trial and Death Penalty Hearing

Defendant contends that the trial court erred a number of times in its conduct of the trial and death penalty hearing, thereby depriving him of a fair and impartial sentencing jury. According to defendant, one of these critical errors was made when the trial court, after the jury had returned guilty verdicts and before a weekend recess following which the death penalty hearing was to be held, failed to admonish the jury not to discuss the case and to avoid all media accounts of the case. Defendant believes that this error entitles him to a new sentencing hearing. We disagree and find that no error was made, much less an error which caused defendant to be denied a fair death penalty hearing by an impartial jury.

The trial court frequently admonished the jury not to discuss the case with anyone and to disregard all accounts in the news media. Addressing the venire, the trial court so admonished all who would be chosen as jurors. The trial court also admonished the jury before opening statements were made, at the end of each of the first three days of the guilt-innocence phase of the trial, and at the end of the first day of the sentencing phase of the trial (at the end of the second day the jury sentenced defendant to death). The court did not admonish

the jury, however, at the end of the fourth day of the trial, after the jury returned guilty verdicts on all charges. Defendant views this sole failure to admonish as critical because the jurors had become accustomed to hearing an admonition at the end of the day yet, at this decisive juncture in the trial, when they had found defendant guilty and were to sentence him after a weekend recess, the court dismissed them with no admonition. It is "inconceivable," states defendant, that the jurors, noticing the absence of an admonition, would not have read and listened to news reports about the case and would not have freely discussed the case over the weekend with relatives and friends, listening to their opinions as to what sentence would be appropriate.

Besides making this observation about human nature, defendant relies on two Federal appellate cases holding that courts are required to admonish juries every time they separate, and a failure to do so warrants a new trial without a defendant's showing actual prejudice. (*United States v. Williams* (8th Cir. 1980), 635 F.2d 744; *Carter v. United States* (D.C. Cir. 1957), 252 F.2d 608.) Defendant also relies on two cases decided by this court in which new death penalty hearings were ordered because before the juries in those cases had decided that the defendants were eligible for the death penalty the jurors had learned that the defendants previously had been sentenced to death in another case. (*People v. Hope* (1986), 116 Ill. 2d 265; *People v. Davis* (1983), 97 Ill. 2d 1.) Defendant also cites cases containing general statements about how the danger that jurors will be improperly influenced is averted by admonitions. None of these cases persuade us that the absence of the admonition in this case was error, much less error so prejudicial as to deprive defendant of a fair sentencing jury.

This court has never decided the issue of whether a trial court's failure to admonish a jury before it sepa-

rates is error warranting a new trial or sentencing hearing. (But see *People v. Brisbon* (1985), 106 Ill. 2d 342, 355-56 (no reversible error when trial court denied defendant's motion to sequester jury and inadequately admonished jury about avoiding news reports, for court repeatedly admonished jury throughout trial and defendant did not show actual prejudice).) Defendant, however, believes that this court's prior decisions in *Hope* and *Davis* are similar enough to provide support for a holding that such conduct is error. We do not share defendant's belief because in *Hope* and *Davis* a critical reason why new death penalty hearings were ordered was that it was undisputed that some or all of the jurors knew, before they had determined that the defendant was eligible for the death penalty, that the defendant had been sentenced to death in another case. Two or three of the jurors in *Hope* learned this through news reports which appeared after the trial judge told the jury at the end of the first day of the sentencing hearing that it did not matter if they read the newspapers. And in *Davis*, the entire jury was told by the State of the defendant's pending death sentence.

We contrast the *Hope* and *Davis* jurors' harmful knowledge to the present case in which there is no evidence that during the weekend recess any news reports appeared stating that defendant had been sentenced to death in his first trial, or discussing any part of the case. Defendant presents no evidence that such news reports existed, but rather speculates that such news reports may have existed and may have contained prejudicial information. Nor does defendant present any evidence that a juror gained such knowledge from any source. Compare *People v. Barrow* (1989), 133 Ill. 2d 226, 233-34 (trial court did not err in denying defendant's motion to read to jurors a newspaper article published during the trial and ask them if any of them had read it, for defend-

ant never gave trial court the article and thus precluded the court from evaluating its prejudiciality, and also the court admonished jury at the start of and throughout trial), with *People v. Cain* (1967), 36 Ill. 2d 589, and *Coppedge v. United States* (D.C. Cir. 1959), 272 F.2d 504 (in both cases defendant requested court to question jurors about specific articles that appeared during trial and that defendant gave to court, and new trial ordered because court's inquiry found to be inadequate).

In essence, defendant is asking this court to hold, without any evidence to support his allegation of prejudice, that he was denied an impartial jury during his sentencing hearing because the court's lone failure to admonish the jury might have resulted in jurors receiving prejudicial information from the media and might have caused jurors to discuss the case with others. We recognize that the court's failure to admonish the jurors created a risk that they would discuss the case and attend to news reports, but without any evidence that the jurors acted improperly we cannot find that that risk resulted in an unfair death penalty hearing or a prejudiced jury. In short, we will not make the presumption defendant requests without evidence that the risk was realized. Defendant must show actual prejudice on the part of a juror, or, given the difficulty of making such a showing, at the very least demonstrate circumstances reasonably justifying a conclusion that a juror was improperly prejudiced against him. He cannot persuade us that he was denied a fair and impartial hearing by merely observing that it would be human nature for a juror to have talked about this murder trial unless admonished at the end of every day of trial. Of course it would have been better if the trial court had admonished the jury again, but the court did not err when it failed to do so and, thus, did not deprive defendant of a fair and impartial jury at his death penalty hearing.

Previously, this court decided a case similar to the present one (*Brisbon*, 106 Ill. 2d 342), and we approve the reasoning used there. Before the trial in *Brisbon* a television news report mentioned that when defendant committed the murder for which he was going to be tried he was serving a long sentence for another murder. Defendant argued that the trial court had denied him a fair and impartial trial because it had refused to sequester the jury, and because it had inadequately admonished the jury to avoid news reports. This court disagreed; the trial court's admonitions at the beginning of and throughout the trial were adequate (our opinion did not state when these admonitions were given), and as long as a jury is adequately admonished and the defendant fails to show actual prejudice he is not denied a fair trial. See *People v. Yonder* (1969), 44 Ill. 2d 376 (not reversible error to deny motion to sequester jury if adequate admonitions given and defendant does not show actual prejudice).

Finally, we disagree with the *dicta* in *Williams* and *Carter*, cited by defendant as support, that a new trial is warranted if a trial court does not admonish the jury each time before it separates (see *People v. Stansberry* (1971), 47 Ill. 2d 541, 545 (Illinois courts not bound by decisions of lower Federal courts)). Furthermore, the facts in *Williams* and *Carter* were so distinct from the facts in this case that it is not apparent that those courts would apply their broad statements of *dicta* to the facts of this case to hold the way defendant urges us to hold. In *Williams*, the entire case was presented to the jury in one day and, without admonishing the jury at any time during that day, the court allowed it to separate; soon after resuming its deliberations the next morning the jury returned a guilty verdict. In the present case, although the jury was not admonished at the end of the one day, admittedly an important juncture in the trial,

the jury had been admonished five times already and so was not ignorant of the warning as was the *Williams* jury. In *Carter*, the trial court failed to admonish the jury before either of two week-long recesses that interrupted the trial, and also apparently had not admonished the jury at any time earlier in the trial. For these reasons, we are not persuaded by the opinions in *Williams* and *Carter*.

Therefore, in this case, in the absence of any showing of actual prejudice, we find that defendant was not denied a fair death penalty hearing by an impartial jury as a result of the trial court's failure to admonish the jury before the weekend recess.

Defendant also argues that he was denied a fair and reliable death penalty hearing because the trial court barred both of his attempts to inform the jury about the possible terms of imprisonment he could serve if the jury did not sentence him to death. Defendant contends that, because the jury was not assured that the law required him to be imprisoned for more than a few years if it did not sentence him to death, the jury might have sentenced him to death thinking it better that he die than that he possibly be back on the streets in a few years if the trial judge sentenced him to a short term of imprisonment, not that the jury sentenced him to death because he deserved to die.

In particular, defendant argues that the trial court erred when it refused to ask the venire the question, "What do you think will happen to Harold W. Bean if you vote for imprisonment rather than death?" and when the trial court refused to instruct the jury at the second stage of the death penalty hearing that if it could not "unanimously find that the death sentence shall be imposed, the court shall sentence the defendant to imprisonment *** [and that defendant's sentence would] be not less than twenty years and up to natural life in

prison. There is no parole from a life sentence." The court, instead of giving defendant's proposed instruction, gave the less informative IPI Criminal 2d No. 7A.15, which states that if the jury does not unanimously find an absence of mitigating factors precluding a death sentence, the court "will sentence the defendant to imprisonment"; this instruction does not state the possible length of that imprisonment.

To support his argument that the trial court erred, defendant cites an opinion of this court holding that in all trials in which a defendant has been convicted of multiple murders the trial court has to instruct the sentencing jury not only that the court will sentence the defendant to a term of imprisonment if the jury finds mitigating factors sufficient to preclude the death penalty, but also that "the defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." (*People v. Gacho* (1988), 122 Ill. 2d 221, 262.) Defendant argues that we should extend the holding in *Gacho* to allow the type of *voir dire* question and jury instruction he proposed in cases, such as the present case, not involving multiple murders. We decline to so hold because the rationale we used in *Gacho* does not support defendant's argument.

*Gacho* was a multiple-murder case, and this fact made it possible that the giving of IPI Criminal 2d No. 7A.15 would mislead the sentencing jury because, by stating that if the jury does not sentence defendant to death the court will impose a sentence of imprisonment, IPI Criminal 2d No. 7A.15 might have led the jury to believe that the defendant could be sentenced to a term of years when the law actually allowed only one sentence of imprisonment in such a case—imprisonment for the defendant's natural life without possibility of parole. (*Gacho*, 122 Ill. 2d at 261-62.) In contrast, in the present case

the jury would have been correct if it had surmised that the court could sentence defendant to a term of years; defendant himself points out that the court could have sentenced him to anywhere from 20 years' to 80 years' imprisonment, or to imprisonment for his natural life (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—8—1(a)(1), 1005—8—2(a)(1)). While we held in *Gacho* that a sentencing jury in a multiple-murder case is to be told that there is only one alternative sentence to death, we do not think that a sentencing jury in a single-murder case should be told of all the possible terms of imprisonment a court might impose on a defendant if the jury does not sentence him to death. The confusion that might result when IPI Criminal 2d No. 7A.15 is given in a multiple-murder case is not created in a single-murder case. But there is another reason we hold it would have been improper for the trial court to inform the jury of the alternative sentences of imprisonment, besides the fact that *Gacho* does not warrant such a holding.

To fairly and fully inform the jury of the alternative sentences of imprisonment in this case would have required the court to also tell the jury that defendant, by earning good-conduct credits provided for by the rules and regulations of the Department of Corrections, could be released from prison after serving less than half of any sentence of imprisonment (other than imprisonment for his natural life) imposed on him (Ill. Rev. Stat. 1979, ch. 38, par. 1003—6—3), after which he would have to serve a mandatory supervised release term of three years or less (Ill. Rev. Stat. 1979, ch. 38, pars. 1003—3—8, 1005—8—1(d)). In short, to fairly and fully inform the jury of alternative sentences would have required the trial court to inform the jury about the entire determinate sentencing system in Illinois. Without this information, without knowing that the executive branch could release defendant from prison before he had served the

full sentence of imprisonment imposed by the trial court, the jury would not have had the capability, which defendant deems valuable, of fairly and accurately comparing a death sentence to alternative sentences of imprisonment the court might have imposed.

Indeed, while we held in *Gacho* that the jury should have been told that the only alternative sentence to death was natural life imprisonment without parole, we disapproved of the defendant's suggested instruction because it was not comprehensive enough: It did not tell the jury that such a sentence could be commuted by executive clemency. Thus, to fairly inform a jury of alternative sentences would require also informing a jury about the possibility of a defendant's being given an early release. Yet giving such information to a jury would be improper for the same reason that, under Illinois' previous indeterminate sentencing system, we held it was improper to inform a jury about the possibility that a defendant would be paroled before serving his full sentence: The information invites the jury to speculate about what the executive branch may do in the future and thus diverts the jury's attention from the issue of what sentence is appropriate given the offender and offense involved. *E.g., Brisbon,* 106 Ill. 2d at 367; see *Gacho,* 122 Ill. 2d at 257-59 (improper for prosecutor to discuss the possibility that defendant may be paroled).

Therefore, we hold that the trial court did not err when it refused to inform the jury, during either *voir dire* or the instruction of the jury, of the range of possible terms of imprisonment to which defendant might be sentenced if he was not sentenced to death. In fact, giving the jury such information would have been error.

According to defendant, the trial court made another error in instructing the jury at the second stage of the death penalty hearing when the trial court allowed the jury to consider both of the statutory aggravating fac-

tors which the jury had found to exist beyond a reasonable doubt at the eligibility stage of the hearing. These two statutory aggravating factors were: "defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(5)), and defendant committed the murder in the course of another felony, an armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)). Defendant argues that, by allowing the jury to consider both statutory aggravating factors when deciding whether defendant should be sentenced to death, the trial court allowed the jury to artificially inflate the aggravating circumstances of his offense; thus the scales were improperly weighted in favor of death.

The evidence showed that before the murder defendant considered that half of any money he found in Polulach's house when he killed her would be his as a share of his fee, which he set at about $23,000. No money was found, but defendant stole jewelry from the house and apparently considered this to be part of his compensation.

At the second stage of the death penalty hearing, the trial court instructed the jury, pursuant to IPI Criminal 2d No. 7A.15, that it was to consider any aggravating and any mitigating factors relevant to the imposition of the death penalty, aggravating factors being those facts providing a reason for imposing the death penalty and including, but not being limited to, the statutory aggravating factors which the jury had found to exist at the end of the first stage of the hearing. Many times we have held that the provisions in our death penalty statute for balancing aggravating and mitigating factors (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(c), (g)), upon which this instruction is modeled, adequately limit and direct the discretion of capital sentencing juries so as to satisfy

constitutional demands. (*E.g., People v. Stewart* (1984), 105 Ill. 2d 22.) We have also explained that sentencing juries are not given improperly broad discretion owing to our death penalty statute's failure to assign a precise weight to each aggravating and mitigating factor a jury potentially will consider. (*People v. Brownell* (1980), 79 Ill. 2d 508, 534.) In this case we find that our death penalty statute was constitutionally applied; the alleged error in instructions did not constitute plain error (for defense counsel failed to object at trial and in his post-trial motion to this instruction, waiving any error other than plain error (see *People v. Precup* (1978), 73 Ill. 2d 7, 16-17)).

Defendant argues that the aggravating circumstances were artificially inflated because defendant's motive for committing the armed robbery of jewelry from Polulach's house at the time he killed her was to get some of the "money or anything of value" which he was owed by the Walterses for committing the murder. In other words, defendant's motive for committing the armed robbery was the same as his motive for committing the murder—monetary gain—and by allowing the jury to consider both statutory aggravating factors the trial court improperly allowed the jury to twice weigh his motivation of monetary gain, resulting in an inaccurate balancing of aggravating and mitigating factors. This procedure, according to defendant, resulted in defendant's being sentenced to death arbitrarily and capriciously, in violation of the eighth amendment, because the particular circumstances of his case were not properly considered by the sentencing jury. U.S. Const., amend. VIII; *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950.

We do not agree with defendant that, because this stolen property was part of his compensation for the murder, the jury, when deciding whether defendant

should be sentenced to death, was not entitled to consider both that he committed an armed robbery during the murder and that he expected to get further compensation for the murder. In death penalty hearings, the Supreme Court has been concerned only that the sentencing body attend to "the particularized circumstances of the individual offense and the individual offender." (*Jurek*, 428 U.S. at 274, 49 L. Ed. 2d at 939, 96 S. Ct. at 2957.) We conclude that by allowing the sentencing jury to consider both the armed robbery and murder-for-compensation statutory aggravating factors, along with any other aggravating or mitigating factors it found to be relevant, the trial court in the present case ensured that the jury considered these particularized circumstances. Capital sentencing juries are given discretion to weigh mitigating and aggravating factors on balancing scales of their own making; neither this court nor the legislature may tell juries how to weigh those factors, as long as the factors are relevant. In this case, the jury was instructed only that it could consider both statutory aggravating factors; the jury was not told how to weigh those factors. The jury was entitled to consider both courses of conduct—that defendant had agreed to commit this murder for a sum of money and that, after he killed Polulach, he ransacked her house looking for valuables and stole her jewelry—regardless of the fact that his motivation in both courses of conduct was to get money. And we cannot conclude that the manner in which the jury considered both aggravating factors was improper.

Defendant rests his argument primarily on *People v. Brownell*, 79 Ill. 2d 508, and on decisions of the courts of other States holding death sentences in armed robbery-murder cases invalid because the sentencing body had considered the redundant statutory aggravating factors that the murder occurred during an armed robbery

and that the murder was committed for "pecuniary gain," even though the pecuniary gain was the proceeds of the armed robbery. *Cook v. State* (Ala. 1978), 369 So. 2d 1251; *Provence v. State* (Fla. 1976), 337 So. 2d 783; *State v. Quesinberry* (1987), 319 N.C. 228, 354 S.E.2d 446.

Neither *Brownell* nor the foreign cases cited by defendant thwart our holding. In *Brownell*, we remanded for a new sentencing hearing because in sentencing the defendant to death the trial judge had relied on the statutory aggravating factor that the defendant had murdered an eyewitness against him, as well as the factor that defendant murdered the victim in the course of two other felonies. We held that the murder-of-an-eyewitness factor did not apply because the legislature had intended it to apply only when a witness was murdered to impede an ongoing criminal investigation, whereas in *Brownell* the defendant had killed the victim when she tried to escape after he had raped her—he did not kill to impede any ongoing investigation. In contrast, in the present case defendant was both convicted of armed robbery and armed robbery was found to be a statutory aggravating factor; this was a valid factor to be applied in the present case. Defendant's only argument is that in considering this applicable aggravating factor the jury might have given undue weight to his motivation of monetary gain for committing both the armed robbery and the murder.

We disagree. The jury was correctly allowed to consider both defendant's conduct in murdering Polulach and his conduct in ransacking her house and stealing her jewelry, even if at the time of the robbery he intended to subtract the proceeds from his total fee for the murder and thus his motivation for both courses of conduct was the same. By allowing the jury to consider both factors when considering the total circumstances of the case, the

court in no way told the jury to consider defendant's motivation of monetary gain as especially heinous because it was the motive behind both the murder and the armed robbery.

As to the three foreign decisions relied upon by defendant, they are significantly different from the present case in that in those cases the two statutory aggravating factors considered by the sentencers, murder during commission of an armed robbery and murder for pecuniary gain, were the result of the identical course of conduct and were proven by identical evidence. The murders were committed during armed robberies, and the pecuniary gains were the proceeds of the robberies; inevitably by murdering during the course of an armed robbery the defendants also murdered for pecuniary gain. This situation concerned the courts in those cases because all defendants who murdered during the felony of armed robbery were automatically disadvantaged in the sentencing process as compared to defendants who committed any other felony which did not inherently involve monetary gain. *E.g., Provence*, 337 So. 2d at 786.

In comparison, under our statute, if defendant had merely committed a murder-for-hire, or merely committed a murder during the course of an armed robbery, no second statutory aggravating factor of murder for pecuniary gain would have inevitably applied. Defendant, however, by his own actions compounded the aggravating circumstances of the murder by proceeding to commit the separate crime of stealing jewelry after he murdered Polulach, and the jury was entitled to consider both courses of conduct when sentencing him. The fact that the evidence indicates that the armed robbery was incidental to defendant's grand scheme of murdering Polulach in return for compensation does not mean that the jury was not entitled to consider both statutory aggravating factors. In fact, there is no reason to believe that

the jury did not consider these factors in just this light and that the jury did not properly evaluate these factors; the court's instruction certainly does not prove otherwise. Thus, defendant has failed to prove his claim that the jury improperly sentenced him to death on these grounds.

Another reason why defendant believes he is entitled to a new death penalty hearing is that, during the prosecutor's closing argument at the second stage of the hearing, the prosecutor discounted the relevance of testimony about defendant's family situation when he was a child. Two witnesses testified for the defense about the tempestuous atmosphere of defendant's childhood home; they related, among other facts, that defendant's father, who drank, died when defendant was 12 years old, causing his mother to work two jobs and preventing her from closely supervising him, and they told how his mother and grandmother frequently argued. Defendant notes that the eighth amendment has been found to require that a capital sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis in original.) (*Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65 (opinion of Burger, C.J., joined by Stewart, Powell, and Stevens, JJ.).) Defendant believes the prosecutor improperly dissuaded the jury from considering the evidence of his childhood, in violation of the eighth amendment, by declaring in his closing argument: "We're dealing with Harold Bean as he sits there right now. *** This is not a course in a person's psychology. We're not here to discern *** how it is that Harold Bean gets to be Harold Bean." Further, defendant believes these comments were so prejudicial as to be plain error (the defense did not object at trial or

in its post-trial motion) which was not corrected by the trial court's instruction, in accord with IPI Criminal 2d No. 7A.15, that the jury "shall consider any aggravating and any mitigating factors that are relevant to the imposition of the death penalty. *** Mitigating factors are any facts or circumstances that provide reasons for imposing a sentence less than the death penalty."

We find that the prosecutor's comments did not preclude the jury from considering the evidence of his childhood in mitigation and thus did not cause defendant to be deprived of a fair and reliable sentencing hearing. The Supreme Court has considered many cases involving the issue of whether a sentencer imposed the death penalty without considering certain relevant mitigating factors of the defendant's individual character and history. In all of the cases in which the Court has vacated death sentences it has found that what precluded the sentencer from considering those mitigating factors was either the death penalty statute (*Lockett*, 438 U.S. at 606-08, 57 L. Ed. 2d at 990-92, 98 S. Ct. at 2965-66 (statute mandated death without allowing sentencer to consider any mitigating factors)) or the trial judge's instructions (*Penry v. Lynaugh* (1989), 492 U.S. 302, 328, 106 L. Ed. 2d 256, 284, 109 S. Ct. 2934, 2952 (jury effectively precluded from considering evidence of defendant's family background in mitigation by trial court's failure to so instruct jury); *Hitchcock v. Dugger* (1987), 481 U.S. 393, 398-99, 95 L. Ed. 2d 347, 353, 107 S. Ct. 1821, 1824 (trial judge thought, and instructed advisory jury, that only statutory mitigating factors could be considered); see *Eddings v. Oklahoma* (1982), 455 U.S. 104, 113-14, 71 L. Ed. 2d 1, 10-11, 102 S. Ct. 869, 876-77 (sentencing judge believed, as a matter of law, that he could not consider defendant's family background as a mitigating factor)). The situation in the present case, where the prosecutor argued that defendant's family background should not be consid-

ered by the jury because it was defendant's present character that mattered, not how he got that character, is so dissimilar to the situation in those cases that they simply do not apply: The prosecutor's comments did not preclude the sentencing jury in the present case from considering evidence of defendant's family background.

There are two reasons why the jury was not precluded from considering this evidence in mitigation. First, the prosecutor's role is not to instruct the jury as to what the law is, and the jury in this case was properly instructed about how it should consider closing arguments. Thus, the prosecutor's attempt to persuade the jury that it should not consider defendant's childhood when sentencing him cannot be equated with a trial court's instruction to a jury that it cannot consider such evidence. Second, the prosecutor's comments here were only persuasive; at no time did the prosecutor tell the jury that the law did not allow it to consider this evidence in mitigation. Prosecutors have wide latitude in closing argument (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445), and, because a cold record cannot convey the actual effect of an attorney's comments, appellate courts accept a trial judge's judgment (unless it is a clear abuse of discretion) that a prosecutor has not exceeded that wide latitude by making a prejudicial comment (*People v. Smothers* (1973), 55 Ill. 2d 172, 176).

We do not find that the prosecutor's comments in this case were so prejudicial as to be plain error which deprived defendant of a fair sentencing hearing; the prosecutor's comments did not create a substantial risk that the jury would think the law prevented it from considering evidence of defendant's childhood as mitigation when deciding whether or not defendant should be sentenced to death (see *Mills v. Maryland* (1988), 486 U.S. 367, 382-84, 100 L. Ed. 2d 384, 399-40, 108 S. Ct. 1860, 1870 (death sentence vacated because there was a substantial

risk that the trial judge's instructions caused the jury to misunderstand how it was to consider evidence in mitigation)).

Defendant next challenges the validity of his death sentence by asserting that the trial court violated his eighth amendment rights when it instructed the jurors at the second phase of the death penalty hearing that "[n]either sympathy nor prejudice should influence" them, in accordance with IPI Criminal 2d No. 1.01(5). Defendant believes this instruction caused the jury to disregard mitigating evidence the defense introduced regarding defendant's character and background, and thus violated the eighth amendment principle that a jury must not be precluded from considering such evidence in mitigation. (*E.g., Lockett*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954.) While defendant recognizes this court's previous holdings that this instruction does not violate the eighth amendment (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445; *People v. Stewart* (1984), 104 Ill. 2d 463, 493-94), he urges us to reconsider these holdings given the recent decision of *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837. We have read *Brown* and have applied the analytical procedures *Brown* outlines for determining the constitutionality of a jury instruction concerning sympathy, yet we conclude the use of the instruction defendant challenges was constitutional.

The Supreme Court explained in *Brown* that whether or not a jury instruction is unconstitutional depends upon how a reasonable juror could have understood the instruction. (*Brown*, 479 U.S. at 541, 93 L. Ed. 2d at 940, 107 S. Ct. at 839.) In determining how a reasonable juror could have understood the instruction, a court has to focus first on the particular instruction challenged; if that is found to be unconstitutional, then the court is to focus on "the instructions as a whole to see if the entire

charge delivered a correct interpretation of the law."
(*Brown*, 479 U.S. at 541, 93 L. Ed. 2d at 940, 107 S. Ct.
at 839.) The instruction in *Brown* referred to "mere sen-
timent, conjecture, sympathy, passion, prejudice, public
opinion or public feeling" (*Brown*, 479 U.S. at 539, 93 L.
Ed. 2d at 938, 107 S. Ct. at 838). The Court held that
this instruction, standing alone, was constitutional. This
holding depended on the existence of the modifying ad-
jective "mere," the placement of the word "sympathy"
in the midst of a list of nouns, and the testimony of 13
defense witnesses during the penalty phase of the trial.
The Court concluded that all of these facts would cause
a reasonable juror to understand the instruction "as an
admonition to ignore emotional responses that are not
rooted in the aggravating and mitigating evidence intro-
duced during the penalty phase." *Brown*, 479 U.S. at
541-43, 93 L. Ed. 2d at 940-41, 107 S. Ct. at 839-40.

In comparison to the instruction in *Brown*, our in-
struction plainly refers to "sympathy or prejudice." It
could be argued a reasonable juror could conclude that
he should not consider sympathy at all, not just sympa-
thy in general and unrelated to the mitigating evidence
introduced by a defendant. Because the jury which sen-
tenced defendant was also instructed to consider "any
mitigating factors that are relevant," which the court
defined for the jury as "any facts or circumstances that
provide reasons for imposing a sentence less than the
death penalty," and because defendant presented four
witnesses at the death penalty hearing who testified to
his background and character, we reject defendant's con-
tention that the "sympathy or prejudice" instruction
caused the jury to believe it could not consider this miti-
gating evidence. (See *People v. Franklin* (1990), 135 Ill.
2d 78, 112-13, (trial court did not err in giving jury the
"sympathy" instruction because it also instructed jury to
consider only mitigating evidence).) We conclude that a

reasonable juror interpreting all of the instructions as a whole would disregard the emotion of sympathy in general when sentencing defendant, yet would consider defendant's evidence in mitigation and base the sentencing decision in part on that evidence and any feelings of sympathy or mercy it elicited in that juror's heart or mind. See *People v. Phillips* (1989), 127 Ill. 2d 499, 543-45 (Illinois death penalty statute does not unconstitutionally bar sentencer from considering sympathy for defendant which is based on evidence because statute requires sentencer to consider any evidence of mitigating factors introduced by a defendant, and in this case sentencing judge apparently properly weighed evidence before sentencing defendant); see also *Brown*, 479 U.S. at 545-46, 93 L. Ed. 2d at 942, 107 S. Ct. at 841 (O'Connor, J., concurring) (jury instructions as a whole "must clearly inform the jury that they are to consider any relevant mitigating evidence about a defendant's background and character").

(As an aside, we note that in 1987, subsequent to the trial in the present case, the Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases adopted pattern jury instructions to be given at death penalty hearings. Included among these new instructions is an instruction to be given at the second stage of a death penalty hearing that is virtually identical to the instruction approved in *Brown*, 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837; it states: "You are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." IPI Criminal 2d No. 7C.01 (Supp. 1989).)

To summarize, we do not find that any error was committed by the trial court or the prosecutor during the conduct of the trial that caused defendant to be denied a fair death penalty hearing or an impartial sentencing jury.

## Claims of Ineffective Assistance of Counsel

To cap his arguments that errors occurring during his trial and sentencing hearing deprived him of a fair trial and sentencing hearing, defendant claims that his counsel was ineffective by not acting to prevent these errors or ameliorate their effects. We dispose of these ineffective assistance of counsel claims by applying the standards announced in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504, 526.

In *Strickland*, the Supreme Court established that for a defendant to prevail on an ineffective assistance of counsel claim the defendant has to prove both that his counsel's representation was constitutionally deficient and that the defendant was prejudiced as a result. Representation is deficient if a reviewing court can conclude that, considering the circumstances as counsel viewed them at the time of the alleged errors and strongly presuming that counsel's conduct was proper and sound trial strategy, it "fell below an objective standard of reasonableness" (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064) and caused a breakdown in the adversarial process (*Strickland*, 466 U.S. at 688-90, 80 L. Ed. 2d at 693-95, 104 S. Ct. at 2064-66). The Court further explained that deficient representation prejudiced a defendant if there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) If it is his conviction defendant is challenging on these grounds, defendant has to prove a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt"; if it is his death sentence defendant is challenging, defend-

ant has to prove a "reasonable probability that, absent the errors, the sentencer *** would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.

In the present case, we conclude that defendant has not proved any of his claims of ineffective assistance of counsel. Our conclusions in each instance are based on the component of the *Strickland* test, competence of counsel or resultant prejudice, which most obviously was not proved, without deciding whether or not the other component was proved. See *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069 (reviewing court may dispose of claim by applying either component and, if it is not proved, need not consider the other component); see also *People v. Johnson* (1989), 128 Ill. 2d 253, 271.

We reject defendant's claims that his counsel made errors during the guilt-innocence phase of his trial constituting ineffective assistance of counsel. As to each alleged error we find either that defense counsel did not err or that the error did not prejudice defendant. That defendant was not prejudiced by his counsel's failure to object to the alleged hearsay portion of Wayne Walters' testimony that Ann Walters and Gerri Smith said defendant had confessed to them follows inevitably from our prior holding that this testimony did not prejudice defendant because, immediately after so testifying, Wayne Walters testified that defendant described in detail how he had killed Polulach. We find that defense counsel might have made a sound strategic decision when he did not object to the relevance of another portion of Wayne Walters' testimony, his testimony that during a discussion about whether Polulach should be killed defendant had commented, " 'Well, it's been done before,' or, 'I've done it before,' or something of that

nature." Defense counsel might have wisely decided not to object to this vague statement so as not to highlight the very conclusion that defendant fears the jury may have drawn: Defendant had previously committed a murder-for-hire. As to defendant's claim that his counsel erred by not objecting to testimony that defendant threatened to kill the Walterses, Ann Walters' mother, and a policeman, we previously found this evidence was relevant to prove the State's allegations that this was a murder for which defendant expected to get paid and relevant to defendant's consciousness of guilt; thus, counsel's objections would not have affected the admission of this testimony and counsel's failure to object could not have prejudiced defendant. (Also, while an objection to the testimony that defendant threatened to kill Ann Walters' mother might have been sustained, it is not reasonably probable that this testimony affected defendant's conviction.) Similarly, counsel's failure to object to evidence of the crimes defendant committed during his flight did not prejudice defendant because this evidence was relevant to his consciousness of guilt, so any objections would have been overruled. To conclude, defense counsel effectively represented defendant at his trial.

Concerning each of defendant's claims of ineffective assistance of counsel at the death penalty hearing, as to each claim defendant has failed to prove that his counsel's alleged errors prejudiced him, for he has not established a reasonable probability that if his counsel had not made these alleged errors the jury would not have found that sufficient mitigating factors existed to preclude a death sentence. This conclusion applies to the claim that defense counsel erred when he did not object to the trial court's failure to admonish the jury before the weekend recess; this conclusion applies to the claim that defense counsel erred when he failed to argue to the trial judge

that the jury should be instructed not to consider in aggravation both that the murder was committed for compensation and that defendant committed an armed robbery in the course of the murder; and this conclusion applies to defendant's claim that his counsel erred when he did not object to the prosecutor's comments in closing argument that the jury should not consider defendant's childhood when determining if any mitigating factors existed sufficient to preclude imposition of the death penalty, and instead should consider defendant's character as it existed at the time of sentencing. There is not even a reasonable probability that the trial judge would have sustained an objection to these comments, much less that a defense objection would have resulted in the jury's finding that mitigating factors sufficient to preclude the imposition of a death sentence existed; the trial judge's most likely response to an objection would have been to blandly state that the prosecutor was commenting on the evidence as he is allowed to do, and that the jury had heard the evidence and could judge the worth of these comments.

To conclude, defendant was not deprived of his constitutional right to the effective assistance of counsel.

### Defendant's Sentences of Death and Imprisonment

Next, defendant requests this court to vacate his death sentence and his sentence of 30 years' imprisonment. In support of his first request, defendant points to the sentences of imprisonment imposed on Wayne and Ann Walters for their involvement in the murder of Polulach, compares them to his own sentence of death, and asserts that his death sentence is unfair and grossly disproportionate, and therefore should be vacated by this court in order "to do justice between him and his co-defendants." In short, defendant asks this court to con-

duct a comparative proportionality review of his sentence and those of the Walterses.

This court's duty, under both the United States and Illinois Constitutions, is to determine whether a death sentence has been imposed arbitrarily or capriciously or is unduly severe considering the circumstances of the offense and the character and rehabilitative prospects of the defendant. *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (eighth amendment does not require comparative proportionality review if statute contains provisions that ensure rational, consistent, nonarbitrary imposition of death penalty, such as a statute that narrows the types of cases in which the death penalty is an available sentence by requiring the existence of one or more statutory aggravating factors, that allows sentencer to consider mitigating evidence, and that provides for meaningful appellate review); *People v. Jimerson* (1989), 127 Ill. 2d 12, 54; *People v. Brownell* (1980), 79 Ill. 2d 508, 542-44; Ill. Const. 1970, art. I, §11.

One procedure that this court has used to determine whether a death sentence in a particular case is unduly severe is to compare it to the sentence of an accomplice or a codefendant. (*Jimerson*, 127 Ill. 2d at 54-55 (while this court acknowledged that it compares death sentences with sentences of accomplices and codefendants, and did so in this case, the court declared that comparative proportionality review is not a feature of capital sentencing in Illinois).) Nonetheless, our focus is on the particular defendant's extent of involvement in the offense, the nature of the offense, the character and background of the defendant, including any criminal record, and his potential for rehabilitation. (See, *e.g., People v. Free* (1983), 94 Ill. 2d 378, 428 (citing *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991, and other cases).) This focus

guarantees the individualized sentencing required by the eighth amendment. (See *Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965.) To sum up, in reviewing the appropriateness of a death sentence, this court will examine the facts of that particular case and the evidence introduced at the trial and death penalty hearing, and, as a matter of reference, it may consider the sentence imposed on an accomplice or a codefendant in light of his involvement in the offense.

After reviewing the evidence in this case, we hold that defendant's death sentence is not excessive. Defendant was the prime mover behind this murder: He gratuitously offered to kill Polulach ("off the bitch") in return for compensation when Ann Walters expressed anger toward her stepmother after her father's funeral; he pressured Ann and Wayne Walters to hire him to kill Polulach, even suggesting that they borrow money from a neighbor when they told him they did not have the money to pay him $2,500 in advance; he planned the details of the killing, how he would dress like a priest to gain access to the house, handcuff Polulach with the help of an accomplice, shoot her, and then escape in a car driven by a second accomplice; he carried out his plan, dressing as a priest and obtaining two guns and two accomplices, handcuffing Polulach's hands and feet, dragging her up a set of stairs while she kicked and screamed, waiting with her after his first gun would not fire while his accomplice went and got a second gun which defendant had the foresight to bring, and then shooting her twice in the back of the head. In addition, there was evidence that defendant had previously been convicted for robbery after he had masqueraded as a policeman to gain entry into another woman's house and then held a gun on her, handcuffed and blindfolded her, and robbed her house. The State also read into evidence defendant's previous convictions for interstate transpor-

tation of forged securities, attempted burglary, extortion, and possession of stolen goods.

Our conclusion that death is not an excessive penalty to impose on defendant is not altered by the fact that Ann Walters, who pleaded guilty to murder, was sentenced to 25 years' imprisonment and three years' mandatory supervised release. The judge who sentenced Ann explained that he had considered that Ann had no criminal record, did not commit the murder herself, and was not the moving force in the murder, for it had been defendant's idea. Nor is our decision altered by the fact that Wayne Walters was sentenced to seven years' imprisonment after pleading guilty to conspiracy, for Wayne had a minor part in this venture and yielded to the pressure put on him by defendant and his wife, Ann. It is true that there probably would have been no murder if the Walterses had not paid defendant $2,500 in advance and promised to pay him more afterward, that the Walterses participated in the planning of the murder, and that hiring another to commit a murder is a statutory aggravating factor qualifying one for the death penalty (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(5)). But none of these facts cause us to conclude that the death sentence imposed on defendant was excessive. The sentence was appropriate given the circumstances of this murder and defendant's character.

Defendant's request of this court to vacate his sentence of 30 years' imprisonment for his armed robbery conviction is based on the fact that the trial judge imposed this sentence without the benefit of a presentence investigation report, as required by section 5—3—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—1). In the past this court has held death sentences valid although imposed after jury sentencing hearings (*People v. Madej* (1985), 106 Ill. 2d 201, 211-12) and nonjury sentencing hearings (*People v.*

*Gaines* (1981), 88 Ill. 2d 342, 373-74) without the sentencer's having the benefit of a presentence investigation report. We have also held sentences of imprisonment valid although imposed without the sentencer's having the benefit of a presentence investigation report when these sentences were imposed after a death penalty hearing had been conducted on the same defendant's other murder convictions. (*People v. Gacy* (1984), 103 Ill. 2d 1.) In each of these cases our holding was based on the reasoning that the sentencing judge received information during the trial and the death penalty hearing that was the substantial equivalent of any information about the defendant's background, criminal history, and physical and mental condition that would have been included in a presentence investigation report.

The same reasoning applies in this case. The judge who sentenced defendant on the armed robbery conviction was present during the entire trial and death penalty hearing and so heard all the evidence then produced concerning defendant's character and background. Furthermore, defendant does not claim that he was prejudiced—he does not claim that there was any information relevant to the judge's sentencing decision that was not presented during these proceedings but would have been included in a presentence investigation report. Therefore, we hold that the sentence of imprisonment imposed on defendant is valid.

### Constitutionality of the Death Penalty Statute

We now consider defendant's arguments that various aspects of the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) violate the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). As to each of these arguments, we reaffirm our prior holdings that the Illinois death penalty statute is not unconstitutional.

The death penalty statute does not violate the eighth or fourteenth amendments by failing to impose on the State a burden of proving beyond a reasonable doubt that no mitigating factors exist sufficient to preclude the imposition of a death sentence. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 292.) As we have explained before, at the second stage of a death penalty hearing a weighing of aggravating and mitigating factors presented by the State and defendant is to occur, and the State has no burden of proving that the weight of these factors is such that a death sentence should be imposed. *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Free* (1983), 94 Ill. 2d 378, 421.

Next, defendant makes two related arguments concerning the constitutionality of the provision of the statute stating: "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g)). Defendant argues that this provision places a burden on a defendant to persuade the jury that he should not be sentenced to death owing to mitigating circumstances, and so tells the jury that death is presumed to be the correct sentence and that the defendant must overcome this presumption. According to defendant, this presumption and the placement of a burden of persuasion on a defendant violates due process and the eighth amendment principle of individualized sentencing. Likewise, defendant argues that an unconstitutional burden of persuasion was placed on him as a result of the jury instructions, which materially tracked the statutory language, and the prosecutor's closing argument.

Defendant appears to misunderstand our prior holdings that it is not unconstitutional to place such a burden of persuasion on a defendant. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 465.) In *Whitehead* this court

stated its holding on this issue in one sentence: It "rejected the defendant's argument that the sentencing provision unconstitutionally places on the defendant the burden of persuasion on the question whether sufficient mitigating circumstances exist to preclude imposition of the death penalty." (*Whitehead*, 116 Ill. 2d at 465.) We restate this holding for defendant's edification: Such a burden of persuasion is placed on defendant by the statute, but this burden is not unconstitutional. See *People v. Olinger* (1986), 112 Ill. 2d 324, 352 (placing upon a defendant the burden of producing evidence of mitigating factors is constitutional).

Placing such a burden of persuasion on a defendant is constitutional because at this point in the hearing the prosecution has already proven beyond a reasonable doubt that a statutory aggravating factor exists making the defendant eligible for the death penalty (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(f)), and the jury is now weighing aggravating and mitigating factors presented by both the State and defendant. This is precisely the kind of capital sentencing procedure approved by the Supreme Court; this procedure both prevents the arbitrary imposition of the death penalty by specifying the class of murderers who are eligible for the death penalty, and provides for consideration of mitigating factors unique to the offense and offender. See *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950.

We note that the defendant does not alone have a burden of persuasion at this balancing stage, for the State is the movant, the party seeking the death penalty, and so bears the primary burden of persuading the jury that, as the statute states, there are no mitigating factors sufficient to preclude the sentencer from imposing the sentence of death for which the defendant is eligible. See *People v. Ramirez* (1983), 98 Ill. 2d 439, 469 (it is proper for the State to have a rebuttal argument at the

death penalty hearing because the State bears "the affirmative of the issue, to show that the death penalty should be imposed").

We note also that because this is a process of balancing intangibles, not of proving facts, it is improper to speak of defendants as having a "burden." After the State as movant has attempted to persuade the jury the death sentence should be imposed, a defendant may attempt to dissuade the jury from doing so. Whether defendant attempts to dissuade the jury, whether he decides to take up this "burden," is up to him; the law does not require him to take it up.

By the same logic we hold that the death penalty statute does not unconstitutionally create a presumption that death is the appropriate penalty; instead, it requires the State first to prove that a defendant is eligible for the death penalty, and then to persuade the jury that, given the aggravating and mitigating factors presented, death is the appropriate penalty. Furthermore, we hold that in the present case neither the jury instructions nor the prosecutor's closing argument relating to this issue was improper.

Further challenging the constitutionality of the Illinois death penalty statute, defendant contends that by giving prosecutors unguided discretion to decide whether to prosecute a capital charge and to decide, after a conviction, whether to seek the death penalty, the statute violates the eighth amendment; defendant has not convinced us that we should abandon our previous rejections of his contention. (See, *e.g., People v. Terrell* (1989), 132 Ill. 2d 178, 226; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 539-43.) We are aware of the holding of the United States District Court for the Central District of Illinois, now on appeal to the United States Court of Appeals for the Seventh Circuit, that the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) is

unconstitutional on these grounds. (*United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246, 1258, *appeal docketed* (7th Cir. June 1, 1989), No. 89—2129.) But we again state that in passing on Federal constitutional questions State courts and lower Federal courts have the same responsibility and occupy the same position. Until the United States Supreme Court has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of a lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541.

Recently, we have also rejected defendant's argument that various aspects of the statute, each of which we have individually held constitutional, in combination result in the arbitrary and capricious imposition of the death penalty. (*People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.) In *Phillips* we considered the combined effect of six of the seven aspects identified by defendant, and defendant's inclusion of the contention that the statute places a burden of proof on a defendant, a contention we have already disapproved in this case, does not alter our conclusion in *Phillips*.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and sentences of death and imprisonment. We direct the clerk of this court to enter an order setting Tuesday, November 13, 1990, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. Defendant is to be

executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court is to send a certified copy of this mandate to the Director of Corrections, to the warden of State-ville Correctional Center, and to the warden of the institution where defendant is confined.

*Judgment affirmed.*

JUSTICE CLARK, dissenting:

Because I believe that defendant correctly argues that he was deprived of his constitutional right to be present at trial by his exclusion from the in-chambers *voir dire* of prospective jurors, I dissent and would reverse and remand for a new trial. The jury in this case was retained for the sentencing phase; the jury found the defendant eligible for the death penalty and sentenced him to death.

Based on defense counsel's concern regarding publicity on both the present proceedings and on the prior trial and subsequent reversal by this court, the trial court judge suggested that any prospective jurors who indicated knowledge of this case would be questioned further in chambers so as not to taint the remainder of the venire. On review of the record, I note that six venirepersons retired to the judge's chambers for further questioning along with the court reporter, prosecution counsel and defense counsel. The defendant apparently remained in the courtroom during these proceedings. In any event, he was not present in the judge's chambers. Each instance of in-chambers *voir dire* will be detailed prior to a legal analysis of the inherent problems with the approach undertaken by the trial court and accepted by the majority.

While the trial court judge had initially stated that prospective jurors would be taken back to chambers for

further questioning when they indicated a knowledge of this case due to prior publicity, the first venireperson to be taken into chambers was questioned for a completely different reason. Venireperson B***, in responding to the judge's questions, indicated in open court that he had previously served on a jury in a murder case and that "perhaps" this might prevent him from being fair and impartial. At this point the trial court judge requested that he come back to chambers along with the court reporter and counsel. Before leaving the courtroom, the trial court judge indicated to those in the courtroom: "Everybody else stay right where you are." The following exchange occurred in chambers:

"THE COURT: All right. Let the record reflect that we are back in chambers with counsel and the juror, B***. Okay. Could you elaborate?

A. Well, the trial was approximately 1978. The lady was accused of murdering her husband in bed. We subsequently found her not guilty. It was a case much to my chagrin where first a long period of the trial, it was eleven to one and I being the one holding out for a guilty. And either I sold my conscience down the stream or recognized the handwriting on the wall. It was either going to be a mistrial or I was going to cave in and I caved in.

THE COURT: Well, look at here, that was in 1970, right?

A. '78.

Q. '78?

A. Yes.

Q. All right. You had these feelings with regard to your services as a juror in that case. You found—you eventually found the guy not guilty.

You know, there is nothing wrong with finding someone not guilty. At the same time—

A. Well, excuse me. If I may interrupt. It was just my feeling that in my heart the lady was guilty and I think the State's Attorney did a poor job.

144

THE COURT: Okay. Well, you know these things happen, okay?

A. But I did what I—I followed the law.

THE COURT: Well, you did the right thing.

Okay. Even though you have these feelings concerning your service as a juror at that time, that is you are supposed to follow the law and so forth and whether it's guilty or not guilty, you know whatever that's what you are supposed to do. So, would you be able to follow the law again?

A. Well, I did it once. I could do it again.

Q. Well, that's all I am asking you to do.

You know what I mean. We are all just human beings. These people are and I am, too, Mr. Bean is, everybody that is over here. Will you be able to listen to the evidence and decide the case on its own merits, is that correct?

A. Um hum.

Q. Okay. Uninfluenced by just—if I am telling you right now that I want you to decide this case on its own merits and the law that I instruct you in this courtroom, would you be able to do that?

A. Yes.

THE COURT: Okay. All right. Fine. Let's go back out."

Once back in open court, the in-chambers exchange was not recapitulated on the record for the benefit of the defendant. Rather, the trial court judge continued, as if without interruption, from his previous questioning in open court:

"THE COURT: *** But you have not otherwise been involved in any other civil or criminal case, is that correct?

A. No, sir.

Q. Okay. All right. As you sit here now, sir, do you believe you're the type of person who would be able to give both sides here a fair and impartial trial?

A. I am.

Q. All right. Is there anything in your background that you think we ought to know about here in assessing whether you could be a fair and impartial juror?

A. No, sir.

Q. Do you think you would be fair and impartial?

A. Yes, sir.

Q. Would you follow the law as I instruct you the law is?

A. Yes, sir."

The record does not indicate that the defendant was ever told of the exchange in chambers. Venireperson B*** remained on the venire as a prospective juror until the defense counsel excused him with the use of a peremptory challenge.

The second venireperson to go back to chambers indicated in open court that she did not think that she could be fair because of the age of the victim (the victim was a senior citizen). The trial court judge stopped her from further comment and took her back to chambers. The court reporter, venireperson N***, defense counsel, and prosecution counsel accompanied the judge to chambers where the following exchange occurred:

"THE COURT: Ms. N***, have a seat.

MS. N***: Okay. The defendant looks very familiar. The more you look at him.

THE COURT: The defendant looks familiar to you. Could you close that door?

A. I mean, I never met him, but he does look familiar.

THE COURT: He looks like somebody you know or what?

A. I mean, maybe I have seen him, maybe the newspaper picture, something.

THE COURT: All right. What did you talk about when you were talking with your friend?

A. Well, a woman that lives alone, someone attacked the way they did, we thought it was wrong. I would go

against—I would go for the State. I wouldn't go for the defendant at all.

THE COURT: So, you kind of have got your mind made up right now, is that what you are saying?

A. Yes.

THE COURT: Based on what you heard in these discussions—

A. Could have been me, you know, living alone.

THE COURT: So, you don't feel you could be a fair and impartial juror?

A. No, I couldn't.

THE COURT: Okay. I am going to excuse you, ***."

Venireperson N*** was then instructed to leave the court via the back door and did not return to the courtroom. Again, the record does not indicate that the defendant was informed about the in-chambers discussion.

The third person to be taken back to chambers for further questioning, venireperson S***, was questioned regarding her concerns about the death penalty. In open court she indicated grave concerns, stating that "I have never felt that I could put any—vote to put anyone to their death." The following exchange occurred in chambers:

"THE COURT: *** All right. Now, I am a little bit confused about your response to my questions, okay?

A. All right.

Q. You said maybe, unique circumstances—I am not sure that I heard what you said here.

What I want to know is, are there some cases in which you could impose capital punishment?

A. No.

Q. If the law said it was appropriate?

A. No.

Q. You just could not do it under any circumstances?

A. I don't think I could. I really don't.

* * *

THE COURT: Okay. All right. You're excused, ma'am."

The record is devoid of any indication that the defendant was informed about the proceedings in chambers when the trial court judge and counsel returned to open court.

Venireperson C***, the fourth prospective juror to go to the court's chambers, was the first venireperson to be questioned based on an indication that he had read some pretrial publicity about this case. The following exchange occurred in chambers:

"THE COURT: Okay sir. Will you tell us about what you heard and saw or—

A. Well, I read in the newspaper that a couple at that time, I think they were living in Chicago, were the victims either that or there were relatives and later on they hired someone to kill her for insurance money.

THE COURT: Um hum. So, that was just a bare bones type of thing?

A. Yes, out of the newspaper article.

THE COURT: Okay. All right. Now, you know just the fact that something is [in] the newspaper, would that prevent you from being fair and impartial here?

A. No, sir.

Q. All right. In other words, they were reporting something in the newspaper, some allegations and so forth. Would you be able to set that aside and judge this case on its own merits?

A. Yes, sir.

Q. That would not affect you, that mere fact that you have seen that in the paper some years ago?

A. No, sir.

Q. Do you remember when this was, how many years ago or how long it was?

A. Oh, it was a while, about—

Q. Okay. So that would have no effect on you, really?

A. No, sir.

Q. Okay. You know, I appreciate you bringing it out, you know. I don't want to unduly single you out, you

know. It just may be you have a better memory than some of the other people, they might have seen it, too.

A. Another thing, I am not sure whether this is the same one, but I think the accused might be a Roman Catholic priest that has been thrown out of the order.

THE COURT: No, I don't think that is the case.

A. Then that's not the one.

THE COURT: All right.

A. But the other one, right.

THE COURT: There was something about a priest that I read to you, you know, about someone dressing up in a priest, you know, uniform or robe and so forth. Okay. All right.

Now, didn't you answer another question, too, I think?

A. Yes, sir.

Q. It says that you would be in favor of imposing the death penalty on every case?

A. No, sir. I thought I answered the one only if there is—

Q. About age or something?

A. No, if criminal evidence against him, if the man is found guilty, yes, in every case—

Q. Okay. Well, what I meant or let me back track. Perhaps you misunderstood me, okay?

A. Okay.

Q. What I was asking at that time is, you know, there are some people that feel sort of like an eye for an eye or a tooth for a tooth, okay? Let me break it down for you.

That some people feel that if a person is guilty of murder and they're convicted in all cases, no matter what the mitigation is, even if it's a husband who murders his wife and she is in extreme pain, no matter what, even given that kind of mitigation that always they should be put to death. Is that the way that you feel?

A. Yes, sir.

Q. You do?

A. Yes, sir.

* * *

THE COURT: Okay. All right. Thank you very much, sir. You're excused."

The trial court judge, court reporter and attorneys returned to open court with no indication that the defendant was ever informed about the in-chambers proceedings.

The trial court judge proceeded to question prospective jurors until the panel of 12 was selected. The court then recessed. When court reconvened the process of choosing two alternates was begun. The prosecution and defense each had two challenges for this portion of the selection process.

Venireperson H*** was the fifth prospective juror to be asked to go back to chambers for further questioning. The trial court judge questioned her about a statement which seemed to indicate that she was against the death penalty in all cases. The following exchange occurred in chambers:

"THE COURT: Now, the reason why I called you back here, ***, is I'm a little confused about your answer. And I realize that you are not placed in this position every day, in people asking you about your belief in capital punishment and so forth.

I want to make sure that I understand what your feelings are with respect to this, okay? I don't want to have to do this in front of the rest of the jurors, because I—you know, okay? So, let me see if I understand what you are saying.

Are there some cases in which you could vote in favor of capital punishment?

A. I don't even know.

Q. Let me give you an example. Let's talk about a case that received some publicity—well, let's forget about that. I don't want to give you particular examples. Let's say it was just the worst crime that you ever heard about, horrible crime in which the Defendant had a terrible record and it was just a rotten no-good crime, rotten

no-good Defendant. There is nothing good about him at all; killed ten babies, okay, just horrible. Could you vote to impose capital punishment on such a case?

A. I would feel bad about it, with the kids.

Q. Oh, sure.

Well, I'm asking you, are there any cases in which you could conceive voting in favor of the death penalty, or would you just automatically be against it in every case?

A. No, I don't think I could be against it in all cases. Since you put it like that, I couldn't.

Q. Well, that's what I'm asking.

Now, there will be law that will guide you with respect to this determination and so forth, and mitigation presented, and aggravation presented, should we get to that point. There is by no means, you know—I'm just asking you about this in the event we get to this.

So, there are some cases in which you could vote in favor of capital punishment, is that correct?

A. Yes.

Q. Okay, fine. Let's go back out there."

In open court, the trial court judge reiterated the question that asked if in some cases the juror could impose the death penalty. Upon her affirmative answer, the trial court judge proceeded with questioning. The record is void of any reference that would indicate that the defendant was made aware of the in-chambers questioning.

The sixth, and last, venireperson to be questioned in chambers outside the presence of the defendant was venireperson O***. This was only the second person to be questioned based on an indication that he had read about the crime in the newspapers. The following occurred in chambers, with the court reporter and attorneys, but outside the presence of the defendant:

"THE COURT: *** Can you tell us what you remember about this?

A. Well, maybe about a year, two years ago, I remember in the Chicago Tribune, the Sunday Magazine, they did a big article about what happened. And I believe they talked to all of the Defendants that were involved. And my wife's friend's father is a retired police detective, and I guess he knew some of the people that were involved in the case, because we all lived in that area, about a half a mile from that.

THE COURT: You are on Keeler?

A. In fact, that same day that the paper came out, we were talking about the case, and we drove over and looked at the house. And the girl told us about what her father said. And we talked about the case between ourselves. It wasn't until you mentioned the man who dressed up as a priest and went in and then I started remembering all the details.

THE COURT: I see. Let me see if I understand what you are telling me so far. Do you have your mind pretty much made up about this case as we are going into it right now?

A. Probably. We had a lot of discussion on it back then. And I think some of the details were they wanted to kill the woman for the money, her husband was involved in trucking, or something like that, and had large amounts of money, couple hundred thousand dollars, and they wanted that.

THE COURT: All right. So, you have read something about this case. You have discussed it with your friends, is that correct?

A. Um-hum.

THE COURT: Do you believe that you could set aside all that and base your decision on this case and the evidence that you would hear in this courtroom and not be influenced by this outside material?

A. I don't know.

THE COURT: You don't know whether or not you could be a fair and impartial juror in this case, in other words, right?

A. That's right.

THE COURT: Have you discussed this with other jurors?

A. No.

THE COURT: I guess you didn't have a chance to.

A. No.

THE COURT: I'm going to discharge you from service in this case."

The trial court judge, court reporter and attorneys returned to open court where the judge continued questioning prospective alternate jurors. Two alternates were chosen following the State's use of one challenge and the defense counsel's use of two challenges. Based on the order that the prospective alternates were questioned, venireperson H*** was not chosen as an alternate.

To summarize the proceedings so far, in this capital case six venirepersons were individually questioned in the judge's chambers outside the presence of the defendant. The court reporter, prosecution and defense attorneys were present. Of the six, four were discharged by the trial court judge for cause, one remained available for the jury but was eventually challenged by the defense counsel, and one remained available as an alternate but, based on the number of alternates needed and the order of those questioned, was ultimately not chosen (she was the sixth prospective alternate questioned, numbers 1, 3, and 4 were challenged, numbers 2 and 5 were selected as alternates).

The majority argues that the defendant does not have a constitutional right to be present at jury selection because the right to a jury only guarantees the right to an unbiased jury. Furthermore, the majority insists that the Supreme Court decisions which address the issue of a defendant's presence base their holdings on statutory or common law principles absent here. These arguments entirely miss the crux of the issue; for nearly a century it has been well accepted that:

"[a] leading principle that pervades the entire law of criminal procedure is that, after indictment found, *nothing* shall be done in the absence of the prisoner. While this rule has, at times, and in the cases of misdemeanors, been somewhat relaxed, yet in felonies, it is not in the power of the prisoner, either by himself or his counsel, to waive the right to be personally present during the trial. \*\*\*

In *Hopt v. Utah*, 110 U.S. 578 it is said: '\*\*\* The prisoner is entitled to an impartial jury composed of persons not disqualified by statute, and his life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors. The necessities of the defense may not be met by the presence of his counsel only. For every purpose, therefore, involved in the requirement that the defendant shall be personally present at the trial, where the indictment is for a felony, the trial commences at least from the time when the work of impaneling the jury begins.' And further: 'We are of opinion that it was not within the power of the accused or his counsel to dispense with the statutory requirement as to his personal presence at the trial. \*\*\* That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods.' " (Emphasis added.) *Lewis v. United States* (1892), 146 U.S. 370, 372-74, 36 L. Ed. 1011, 1012-13, 13 S. Ct. 136, 137-38.

While the Supreme Court in *Hopt* obviously discussed the statutory construction of the Utah law, and in *Lewis* recognized the common law rights granted to the individual, of particular importance to this case, *Hopt* and *Lewis* noted that an individual's *right to be present* at trial begins with the impaneling of the jury.

The Supreme Court has not expressly rejected the broad language in *Hopt* and *Lewis* in subsequent cases. My review of the cases indicates that although the Court

limited the application of its two earlier cases, it did so only while continuing to recognize the very basic concept that the defendant has a right to be present during all stages of his trial.

*Diaz v. United States* (1912), 223 U.S. 442, 56 L. Ed. 500, 32 S. Ct. 250, dealt with a defendant who absented himself during the examination and cross-examination of two witnesses. Before addressing the issue of the defendant's voluntary withdrawal from the courtroom, the Court first noted:

> "In cases of felony our courts, with substantial accord, have regarded it [the right to be present during trial] as extending to every stage of the trial, inclusive of the empaneling of the jury and the reception of the verdict, and as being scarcely less important to the accused than the right of trial itself. And with like accord they have regarded an accused who is in custody and one who is charged with a capital offense as incapable of waiving the right; the one, because his presence or absence is not within his own control, and the other because, in addition to being usually in custody, he is deemed to suffer the constraint naturally incident to an apprehension of the awful penalty that would follow conviction." (223 U.S. at 455, 56 L. Ed. at 505, 32 S. Ct. at 254.)

Only after acknowledging this basic right, not disavowing it, did the Supreme Court go on to note that in certain cases the right could be inoperative. The Supreme Court quoted at length from District of Columbia Court of Appeals decision's reasoning which it found sound:

> " 'The question is one of broad public policy, whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries, and turn them into a solemn farce, and ultimately compel society, for its own safety, to restrict the operation of the principle of personal liberty. Neither in criminal nor in civil cases will the

law allow a person to take advantage of his own wrong. And yet this would be precisely what it would do if it permitted an escape from prison, or an absconding from the jurisdiction while at large on bail, during the pendency of a trial before a jury, to operate as a shield.' " (223 U.S. at 458, 56 L. Ed. at 506, 32 S. Ct. at 255, quoting *Falk v. United States* (1899), 15 App. D.C. 446, 460-61.)

The *Diaz* Court held that a defendant could not purposefully absent himself and then claim that he was wrongly convicted based on his absence. The Court specifically indicated that the prior rulings in *Hopt* and *Lewis* did not prevent its present ruling. *Diaz*, 223 U.S. at 458, 56 L. Ed. at 506-07, 32 S. Ct. at 255.

The Supreme Court next addressed the issue of a defendant's presence at trial proceedings in *Snyder v. Massachusetts* (1934), 291 U.S. 97, 78 L. Ed. 674, 54 S. Ct. 330. *Snyder* involved a defendant's claim of error based on his absence from the jury's view of a specific scene. The *Snyder* Court, specifying that language about a defendant's presence found in *Hopt* and *Lewis* was *dictum* (291 U.S. at 117 n.2, 78 L. Ed. at 684 n.2, 54 S. Ct. at 336 n.2), without explicitly stating which language, specifically noted that "[n]owhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow." (291 U.S. at 106-07, 78 L. Ed. at 678, 54 S. Ct. at 332.) The Court held that, "[s]o far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." (291 U.S. at 107-08, 78 L. Ed. at 679, 54 S. Ct. at 333.) Rather, the defendant's presence must "bear[ ], or may fairly be assumed to bear, a relation, reasonably substantial, to his opportunity to defend." (291 U.S. at 106, 78 L. Ed. at 678, 54 S. Ct. at

332.) The defendant's presence is a "privilege [which] may be lost by consent or at times even by misconduct." 291 U.S. at 106, 78 L. Ed. at 678, 54 S. Ct. at 332.

The Court did not overrule its prior decisions in *Hopt* and *Lewis*, wherein the Court had found the defendants' absence error; rather, the Court said that not *every* absence is error. In *Snyder*, the defendant's presence at the jury's view would have offered nothing, it would have been "useless."

In *Illinois v. Allen* (1970), 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057, the Court was confronted with the question of a defendant's presence during the *voir dire* and portions of the trial when "he engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." (397 U.S. at 338, 25 L. Ed. 2d at 356, 90 S. Ct. at 1058.) The trial court had removed defendant from the courtroom; following conviction the defendant asserted that he had been wrongly convicted in his absence. The Court reiterated its unchanged position, as enunciated in *Lewis*, that "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause is the *accused's right to be present in the courtroom at every stage of his trial.* [Citation.]" (Emphasis added.) (*Allen*, 397 U.S. at 338, 25 L. Ed. 2d at 356, 90 S. Ct. at 1058.) However, the Court relied on Mr. Justice Cardozo's statement in *Snyder*, wherein the Court held that the privilege could be lost, and held:

> "Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights [citation], we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot

be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." (397 U.S. at 343, 25 L. Ed. 2d at 358-59, 90 S. Ct. at 1060-61.)

Once again, the Supreme Court recognized the right of a defendant to be present before it concluded that the right could, in certain circumstances, be lost.

Furthermore, the Supreme Court's decision in *United States v. Gagnon* (1985), 470 U.S. 522, 84 L. Ed. 2d 486, 105 S. Ct. 1482, is not on point. *Gagnon* involved an in-chambers conference on the afternoon of the first day of trial between the trial judge, a juror, and defendant Gagnon's counsel. The defendants, other defendants' attorneys and prosecution attorneys were excluded. The conference was necessitated by a juror's concern over defendant Gagnon's sketching of the jurors during the morning's proceedings. The judge had already ordered Gagnon, in open court, to cease the practice of drawing. The purpose of the conference, suggested by Gagnon's lawyer, was to ascertain if the juror was now prejudiced against the defendant and to assure the juror that the defendant had been instructed to refrain from making any further drawings. The Court cited to language in *Snyder* which indicated that the defendant's presence is required when there is a reasonably substantial relationship to the opportunity to defend against the charge before it held that there was no such substantial relationship in this case. 470 U.S. at 526-27, 84 L. Ed. 2d at 490, 105 S. Ct. at 1484.

Though no case previously decided by this court is exactly on point, this court has previously addressed the issue of a defendant's presence at trial. *People v. Smith* (1955), 6 Ill. 2d 414, presented a case in which the defendant was present through the close of the State's

case but was absent from the remainder of the proceedings. He was convicted *in absentia*. This court noted both the right of the defendant to be present and that the right could be waived before finding that, in the absence of an affirmative statement that the defendant's absence was voluntary or that he had waived his right to be present, the case must be remanded for a new trial. This court noted:

> "The law is clear that an accused has the right to appear and defend in person as well as by counsel, and that he is entitled to be present and to participate at every stage of the trial. [Citation.] *** Where the accused is not present in person, the error is not cured by the presence of his counsel, as his attorney has no power to waive his right to be present. [Citation.]
>
> It is also well established that this constitutional right to be present at every step taken in his case may, like many other rights, be waived by the prisoner. Thus where a defendant voluntarily absents himself from the courtroom at the moment a verdict is rendered, or runs away from the court after he learns of the verdict, *** he is deemed to have waived his right to be present and cannot claim any advantage on account of his absence. [Citations.]" (6 Ill. 2d at 416-17.)

This court concluded that, because the record failed to show that the defendant's absence was voluntary or that the defendant had waived the right to be present, he was entitled to a new trial. 6 Ill. 2d at 419.

The question of waiver of the right to be present was further addressed by this court in *People v. Mallett* (1964), 30 Ill. 2d 136. In *Mallett* the court had taken a brief recess. When the trial resumed, a witness began to answer questions before defense counsel noted that the defendant was not present. The defendant was brought in and the court started to explain what had occurred during his absence. The prosecutor interrupted and asked the defense counsel to stipulate that the testimony

would be the same. Both defense counsel and the defendant replied "Yes." (30 Ill. 2d at 141.) Despite the defendant's acquiescence, this court noted that:

> "[w]aiver assumes knowledge [citation] and it cannot be said that the defendant knowingly waived his right to be present unless he was fully advised as to the testimony which had been heard in his absence." (30 Ill. 2d at 142.)

See also *People v. Davis* (1968), 39 Ill. 2d 325 (conviction reversed and remanded for a new trial where entire trial was held in defendant's absence).

This court's decision in *People v. Martine* (1985), 106 Ill. 2d 429, is not contrary to the law already enunciated. In *Martine* the defendant was being questioned on redirect when the prosecutor objected to the questioning, stating that it was beyond the scope of the cross-examination. At the suggestion of the prosecution, the defendant was asked to leave the courtroom while an offer of proof was made by defense counsel. (106 Ill. 2d at 438.) This court noted its agreement with the defendant that there was no valid reason for her exclusion but held that it did not "violate her constitutional rights, for she was absent only during argument on a question of law, and this did not violate her right to be present at every step of the proceedings." 106 Ill. 2d at 440.

*Martine* should not be read so broadly as to suggest that a defendant's right to be present is satisfied when he is allowed to meet witnesses face-to-face and hear testimony presented against him. This court acknowledged that a defendant has a right to be present in order to protect a substantial right. (*Martine*, 106 Ill. 2d at 439.) Only when a defendant's presence would be useless or when the court is addressing only a question of law to which the defendant could add nothing is the defendant's presence not required. (106 Ill. 2d at 440.) The defendant's presence during *voir dire* is neither useless nor a matter involving only a question of law.

Moreover, the Illinois Constitution offers the following protection:

"§8. Rights After Indictment

In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel; to demand the nature and cause of the accusation and have a copy thereof; to meet the witnesses face to face and to have process to compel the attendance of witnesses in his behalf; and to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." Ill. Const. 1970, art. I, §8.

The right to be present is separate and distinct from the right to confront witnesses. Though, as both the United States Supreme Court and this court have held, the right may be waived or may not attach to certain proceedings where presence would be useless, neither this court nor the United States Supreme Court has ever held that the selection of the jury was such a "useless" portion of the proceedings. As noted by the Supreme Court in *Hopt* and *Lewis*, discussed above, and never disavowed, the selection of the jury is crucial. In the hands of these 12 people may lie the very life of the defendant. This court is not here confronted with a decision of law over which the defendant may have no input—were that so, the process of impaneling a jury would not require the extensive questioning process used in *voir dire* and we would merely choose the first 12 people who happen to walk into the room. The present case, on review of the record, does not give indication of a knowing and intelligent waiver by the defendant or of such conduct on the part of the defendant as to require his removal. He was simply not included in the in-chambers *voir dire* process.

While the majority argues that of the prospective jurors questioned, the defendant could not have had any impact upon the selection process because most were dis-

charged for cause by the court, this argument begs the question. The end does not justify the means used. Only after the right was denied are we able to say with certainty that the defendant would have had no input as to the four. Such hindsight may not excuse the denial of such an important right.

Even *one* juror's discharge without the defendant's full presence is too much, as this case clearly shows. Venireperson B***, discussed at length above, was excused with the exercise of a peremptory challenge by the defendant's own counsel. This action was taken without benefit of the defendant's full input into the selection process. It is well accepted that the selection of a jury is based extensively on subjective analysis. Had the defendant been present for all phases of the *voir dire*, it is quite possible that the juror's demeanor and answers would have caused the defendant to persuade his attorney not to exercise a peremptory challenge and to keep the venireperson on the jury. In a capital case, where *one* juror's vote may prevent the imposition of the death penalty, this court should not conclude that a defendant's absence when even a single juror is questioned may be allowed. Neither can this be called harmless error, for a basic right guaranteed by our Constitution and our system of justice was denied the defendant without his waiver or fault. The defendant lacked vital information on which to assist his counsel with the selection of the jury as to venirepersons B*** and H***.

Errors of such a constitutional magnitude must not be negated based on a misconstruction of the issue. I do not deny that a defendant is entitled to an impartial jury. I note, however, that that is not the crux of the issue before this court. The defendant was denied his right to be present during *all proceedings* against him. The denial of that right is not cured or corrected by arguing instead that it does not matter because he had an impartial jury.

162

It does not matter that the defendant had an impartial jury. The defendant's presence is vital to our system of justice and I therefore dissent.