THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEROY HAIRSTON et al., Defendants-Appellants.

First District (1st Division) Nos. 1—87—2275, 1—87—2549 cons.

Opinion filed December 17, 1990.—Rehearing denied January 31, 1991.—Modified opinion filed February 11; 1991.

Marie Harrigan, of State Appellate Defender's Office, of Chicago, for appellants.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Mark A. Shlifka, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Leroy Hairston and Herman Warr were charged with aggravated kidnapping (Ill. Rev. Stat. 1987, ch. 38, par. 10—2(a)(3)), armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)), and aggravated battery (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a)). Both were found guilty after a bench trial and were sentenced to concurrent terms for the crimes. For the reasons below, we affirm.

Two conflicting versions of the crimes were presented at trial, that of the complaining witness, Olaide Olumini, and that of defendants. The trial court accepted Olumini's version.

Olumini testified that on the morning of February 2, 1987, he attended an accounting class at Roosevelt University in Chicago. Although he had attended all semester, he could not remember the professor's name. When the class was over, he drove to the north side to visit a friend.

Olumini parked his car near the intersection of Glenlake and Kenmore Avenues, and when he got out, he was approached by two men whom Olumini later identified as Hairston and Warr. Hairston had a gun. The defendants put Olumini in their car, where they took his wallet and $100.

Olumini testified that the defendants drove about four blocks south to a building at 5420 North Kenmore, where they took him in-

side and tied him to a bed. Olumini said he had never been in the building before. In the building, Olumini testified, the defendants demanded more money. The defendants left the building, and Olumini testified he was beaten for about two hours before he fell asleep.

The defendants returned and drove Olumini in a light blue Cadillac to an apartment at Glenlake and Kenmore. Hairston demanded more money, then the defendants, and others in the apartment, left the apartment, forcing Olumini with them at gunpoint. Olumini testified they went down the back stairs and climbed a fence. Olumini said he fell while climbing and screamed for help. The others ran away.

Olumini was helped by Ms. Barbara Smith, who had responded to his calls. The police were summoned, and Olumini identified Hairston at the scene. The police took Olumini to the police station at Clark and Devon, where he identified Warr. Olumini stated he had never seen his attackers before and that he had never used drugs.

On cross-examination, the trial court refused to allow extended questioning about Olumini's relationship with the defendants and whether he dealt drugs. The trial court also refused to allow questions concerning whether the building at 5420 Kenmore was a drug house and whether Olumini knew the neighborhood. The trial court further refused to allow the testimony of two witnesses to impeach Olumini's statement that he did not know the defendants.

Defendants presented a conflicting version of the event. Warr testified he was a drug dealer and ran three drug houses in the Kenmore neighborhood. Hairston was a security guard at Warr's drug houses. Warr said he had known Olumini since the summer of 1986.

Warr testified that on February 2, 1987, Olumini conducted a drug transaction at 5420 North Kenmore and returned at about 3:30 p.m. to set up another deal at 1041 Glenlake. Hairston and Warr arrived at the Glenlake apartment before 6 and 7 p.m. Olumini was already there, smoking cocaine. Olumini made a phone call, explaining that he was waiting for someone to answer a page. Warr became restless and demanded his money back. A fight broke out, and Hairston pulled his gun and intervened.

A few minutes later someone yelled that the police were coming. Everyone ran down the back stairs and climbed over a fence. Olumini fell. He asked for help but no one stopped. Hairston and Warr were later arrested.

Several other witnesses testified to their roles in the incident. Ms. Barbara Smith testified that while having dinner at her mother's apartment on Glenlake, she heard a man screaming outside. There

were other men around him, and she went to help. As she approached, the other men left. One man, whom Ms. Smith identified as Hairston, walked away slowly with his left hand behind his back. She followed him until he was arrested a short time later. Ms. Smith did not know who called the police.

Officer Derek McClinton testified that while on patrol at about 7 p.m., he and his partner had been flagged down by Ms. Smith, who pointed out Hairston. Hairston threw down a gun, and they arrested him.

Officer William Blake testified that he was called to the scene, where he found Olumini. He drove to where Hairston had been caught, and Olumini identified Hairston. Officer Blake later found the gun Hairston had tossed.

Officer Paul Cardon testified that he arrested two of Hairston and Warr's codefendants, not parties to this action. One of the codefendants had $100 on him, and another was arrested at 5420 North Kenmore. Officer Cardon identified a picture of the bed where Olumini had been tied. It was clean and had no bloodstains.

Officer David Rucci testified that he and his partner had staked out the blue Cadillac at 1041 Glenlake and there arrested Ricky Warr, brother of defendant Herman Warr. Officer Rucci further testified that Olumini had identified Ricky as Herman's brother. Later, when a woman tried to take the car, Rucci talked to her and drove to an apartment on North Winthrop, one block west of Kenmore, where he arrested Herman Warr.

Detective James Gildea testified that he met Olumini at the police station and that Olumini identified Warr in a lineup. Gildea testified that Olumini had told him the crime occurred at 3:55 p.m. Blood was found on Hairston's and Warr's clothing when they were arrested, but tests were inconclusive.

Warr's uncle, Joe Wilson, testified that he had known Olumini for about six months, having met him through his nephew. Wilson stated that Olumini dealt drugs with Warr. Wilson testified that Olumini had asked for $3,000 to drop the charges against Warr and that the events of February 2, 1987, centered around a soured drug deal.

Warr's sister, Kimberly Warr, testified that she knew Olumini through her brother and that Olumini dealt drugs. She stated that she had seen Olumini at 5420 North Kenmore and at another apartment at 5420 West Potomac.

After closing arguments, the trial court found Hairston and Warr guilty of aggravated kidnapping, aggravated battery, and armed robbery. Defense counsel for Warr moved for a new trial based on new

evidence, that Olumini was not a student at Roosevelt University, and that he was an illegal alien. The trial court denied the motion.

Defendants were sentenced to five years' imprisonment for aggravated battery. Hairston was sentenced to 10 years each for aggravated kidnapping and armed robbery, and Warr was sentenced to eight years each for aggravated kidnapping and armed robbery. The sentences were to be served concurrently. Defendants appeal.

We first note that the record supports the finding of guilt. Defendants contend their version of events was more credible than Olumini's, but the trial court, weighing all the evidence, accepted Olumini's testimony, which established each element of the crimes charged. No witnesses, save defendants and their family members, contradicted Olumini.

■ The trial court limited the cross-examination of Olumini and prohibited impeachment witnesses and other offers of proof to establish that he was a drug dealer acquainted with defendants, but the trial court was within its discretion to do so. Olumini repeatedly denied knowing defendants or their friends, or dealing with drugs. Olumini testified that when he was taken into the building at 5420 North Kenmore, he had seen the address. The trial court indicated that it understood the points defense counsel sought to make and found that the record was sufficient to support defendants' theory.

■ Defendants' version of events was not implausible, but the trier of fact found defendants guilty, and the record supports that verdict. Viewing the record most favorably to the State, therefore, it is impossible to conclude that no rational trier of fact could have found defendants guilty beyond reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.

■ Defendants argue that the trial court erred in denying their motion for new trial based on new evidence. Defense counsel asserted that Olumini was not a student at Roosevelt University, as he claimed, and that Olumini had problems with his immigration status, two facts which, defendants contend, would have given Olumini a compelling motive to lie about his involvement in drug dealing. The trial court's ruling was proper, however, because the evidence proffered by defendants was not likely to have changed the outcome on retrial and could have been discovered prior to trial through due diligence. See *People v. Cooper* (1987), 164 Ill. App. 3d 734, 518 N.E.2d 260, *appeal denied* (1988), 119 Ill. 2d 562.

No doubt Olumini would have faced deportation had he been dealing drugs. But the fact that Olumini was not a student and had problems with his immigration status, even if true, was not conclusive evi-

dence of drug dealing or that defendants did not commit the crimes with which they were charged. Rather, the new evidence only supported defendants' theory that Olumini was lying about defendants to hide his involvement with drugs, a theory defense counsel had established and which the trial court rejected.

Further, as the trial court noted, the evidence defendants sought to present could have been discovered prior to trial through a more diligent investigation. Defense counsel contends that it was impossible to discover Olumini's student and immigration status before trial because Olumini refused to be interviewed, and defense counsel had the wrong name and social security number. The record, however, beginning with the original police report, consistently uses Olumini's correct name. The trial court correctly refused to grant a new trial.

■ Defendants contend, in the alternative, that if the evidence of Olumini's immigration status was not sufficient to grant a new trial, the failure to uncover the evidence before trial constituted ineffective counsel. But because the evidence was not outcome determinative, defendants were not prejudiced by counsel's failure to uncover the evidence. *People v. Bean* (1990), 137 Ill. 2d 65, 130-33, 560 N.E.2d 258.

■ Defendants next raise a series of arguments concerning sentencing, but we find no reversible error. Aggravated battery and armed robbery were not, as defendants contend, the lesser included offenses of aggravated kidnapping. More importantly, the crimes charged here could be established by separate, independent acts occurring during the encounter. Conviction for all three offenses, therefore, and concurrent sentences, was appropriate. See *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.

■ Further, although the trial court stated that aggravated battery carried a minimum sentence of five years, which is actually the maximum sentence (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1), that statement cannot support reversal on grounds that the trial court intended to impose the minimum penalty. The record shows that the trial court applied the proper sentencing statute, and also contains an accurate statement by the trial court of the sentencing range. Moreover, the sentence for aggravated battery was to be served concurrently with a longer sentence for aggravated kidnapping. We therefore find no reversible error.

■ Defendant Hairston argues that a previous felony conviction that was reversed was improperly considered by the trial court in passing sentence. The trial court stated, "[Hairston's] actions are, I think, the most reprehensible of all and having escaped when he did

the last time to go back into this kind of life kind of boggles me." The record shows unmistakably that the trial court knew Hairston's prior conviction had been reversed and that he had not been retried. The trial court's comment indicates not the belief that Hairston had gotten away with something, and was not susceptible to rehabilitation, but rather, that Hairston consciously chose the criminal life. The trial court's comment clearly and properly focussed on Hairston's behavior at the time he committed the crime for which he was being sentenced.

■ Finally, Hairston argues that the commitment order, which shows he was sentenced to 10 years for aggravated kidnapping, should be changed to reflect the eight-year sentence the trial court intended to impose. The record here shows that the trial court first stated that Hairston was to receive 10 years, but later stated the sentence was eight years. The record also shows, despite inconsistent statements by the trial court, a consistent reference to a 10-year sentence. In the absence of a clear conflict between the commitment order and the trial court's judgment, the commitment order need not be amended.

In summary, the record supports the finding of guilt and that defendants were able to establish their defense theory. The trial court correctly denied defendants' motion for new trial, and no reversible error was made in sentencing. Accordingly, we affirm.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.